# United States Court of Appeals

*for the*

# First Circuit

---

Case No. 22-1837

GIBSON FOUNDATION, INC., a Delaware corporation,

*Plaintiff-Appellant,*

v.

ROB NORRIS, a citizen of Massachusetts, d/b/a The Piano Mill;
PIANO MILL GROUP, LLC,

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT OF
MASSACHUSETTS, BOSTON IN CASE NO. 1:20-CV-10682-IT

## BRIEF FOR PLAINTIFF-APPELLANT

ANDREA BATES
KURT SCHUETTINGER
BATES & BATES LLC
1890 Marietta Boulevard, NW
Atlanta, Georgia 30318
(404) 228-7439

STEVEN D. HOWEN
LAW OFFICES OF STEVEN HOWEN
7111 Bosque Boulevard
Suite 305
Waco, Texas 76710
(254) 826-6526

*Counsel for Plaintiff-Appellant*

**DISCLOSURE STATEMENT** (Fed. R. App. P. 26.1:

Gibson Foundation, Inc. does not have any parent corporation nor any publicly

held corporation that owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT .................................................................i

TABLE OF AUTHORITIES ...............................................................iv

JURISDICTIONAL STATEMENT ........................................................1

    District Court Jurisdiction ...............................................................1

    Appellate Jurisdiction .....................................................................2

    Timeliness of Appeal and Brief......................................................3

    Appeal From a Final Judgment ......................................................3

STATEMENT OF THE ISSUES...........................................................4

STATEMENT OF THE CASE...............................................................4

    The Parties ......................................................................................4

    The Piano .........................................................................................5

    The Transfer of the Piano ...............................................................5

    Piano Mill's Possession of the Piano..............................................7

    The Dispute Arises .........................................................................9

    The Dispute Matures Into A Lawsuit ...........................................11

    The Summary Judgment Motions .................................................11

    The District Court Summary Judgment Ruling and Final Judgment............13

SUMMARY OF THE ARGUMENT .....................................................14

ARGUMENT AND AUTHORITIES....................................................15

    I.     Summary Judgment Standard and Standard of Review......................15

    II.    The District Court Erred in Ruling on Summary Judgment that the Massachusetts Statute of Limitations Barred Gibson Foundation's Contract-Based Claims Against Norris........................17

          A.    Legal Standard .................................................................17

          B.    Discussion .......................................................................25

ii

   i.  Evidence on the Record Supports A Finding That Gibson Brands, and then Gibson Foundation, Gave Temporary Possession, But Not Title or Ownership, of the Piano to Norris and Piano Mill for an Indefinite Period..................................................26

   ii.  Massachusetts Law Supports A Finding that A Bailment Agreement Existed Between Gibson Brands, On The One Hand, and Rob Norris and/or Piano Mill, On The Other Hand .........................28

 III. The District Court Erred in Ruling on Summary Judgment that Gibson Foundation Failed to Present Evidence Specific Enough to Establish a Bailment Agreement with Norris and/or Piano Mill..................................................................35

  A. Discussion ................................................................36

   i.  Whether the Contract Gibson Foundation Alleges Exists is a Fact Issue Reserved For the Jury.............................................................36

   ii.  The District Court Improperly Disregarded Evidence of Emails Between Gibson Brands Employees....................................................41

   iii. Gibson Foundation Provided Sufficient Evidence to Demonstrate Its Ownership of the Piano...................45

CONCLUSION .......................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Aegis Investigative Grp. v. Metro. Gov't of Nashville & Davidson Cnty.*,
    98 S.W.3d 159 (Tenn. Ct. App. 2002)................................................29

*Ahmed v. Johnson*,
    752 F.3d 490 (1st Cir. 2014).................................................................17

*Aimtek, Inc. v. Norton Co.*,
    69 Mass. App. Ct. 660, 870 N.E.2d 1114 (2007) ........................ *passim*

*Albrecht v. Abouhamad*,
    2000 WL 198931 (Mass. Super. 2000)................................................36

*Atlantic Fin. Corp. v. Galvam*,
    311 Mass. 49, 39 N.E.2d 951 (1942)............................... 18, 21, 22, 47

*Austell v. Sprenger*,
    690 F.3d 929 (2d Cir. 2012) ...............................................................26

*Barth v. City of Cranston*,
    44 F.4th 65 (1st Cir. 2022)...................................................................17

*Basic Controlex Corp. v. Klockner Moeller Corp.*,
    202 F.3d 450 (1st Cir. 2000)................................................................16

*Baskin-Robbins Franchising LLC v. Alpenrose Dairy*, *Inc.*,
    825 F.3d 28 (1st Cir. 2016)....................................................................1

*Burnett v. OceanProps, Ltd.*,
    2:16-cv-00359 (D. Me., Oct. 26, 2018) ..............................................43

*Capobianco v. City of New York*,
    422 F.3d 47 (2d Cir. 2005) .................................................................44

*Carrizosa v. Chiquita Brands Int'l, Inc.*,
    47 F.4th 1278 (11th Cir. 2022) ..........................................................45

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ...................16

*Cohen v. Gilmore (In re Ala. & Dunlavy, Ltd.)*,
    983 F.3d 766 (5th Cir. 2020) ..............................................................44

*Commodore Leasing Inc. v. Metropolitan Comm'n.,*
16 Mass. App. Ct. 266, 450 N.E.2d 1097 (Mass. App. 1983).......................30-31

*D.A. Schulte, Inc. v. North Terminal Garage Co.,*
197 N.E. 16 (Mass. 1935).........................................................................29

*Dennis v. Kaskel,*
(Mass. Super. 2012) (Unpublished)............................................................37

*Drescher v. Traveler's Ins. Co.,*
359 Mass. 458, 269 N.E.2d 651 (Mass. 1971) ............................................30

*Dusel v. Factory Mut. Ins. Co.,*
52 F. 4th 495 (1st Cir. 2022)....................................................................34

*Ellis v. Fid. Mgmt. Tr. Co.,*
883 F.3d 1 (1st Cir. 2018).......................................................................17

*Global NAPS, Inc. v. Verizon New England, Inc.,*
Civil Action No. 02-12489 and 05-10079-RWZ, 2015 WL 12781223
(D. Mass. March 10, 2015) ...................................................................38-39

*Goudy & Stevens, Inc. v. Cable Marine, Inc.,*
924 F.2d 16 (1st Cir. 1991).....................................................................29

*Hertz Corp. v. Friend,*
130 S. Ct. 1181, 175 L. Ed. 2d 1559 U.S. 77 (2010).....................................2

*Hosp. San Antonio, Inc. v. Oquendo-Lorenzo,*
47 F.4th 1 (1st Cir. 2022)........................................................................17

*I & R Mech., Inc. v. Hazelton Mfg. Co.,*
61 Mass. App. Ct. 454 (2004)..................................................................36

*Indiaweekly.com, LLC v. Nehaflix.com, Inc.,*
Case No. 07-cv-0194 (TLM) (D. Conn., June 6, 2011) ................................43

*Jacoby v. Keers,*
Case No. 17-13400 (11th Cir. July 22, 2019)..............................................45

*Katz v. Belveron Real Estate Prtnrs, LLC,*
28 F.4th 300 (1st. Cir. 2022)...................................................................16

*King v. Trustees of Boston Univ.,*
420 Mass. 52, 647 N.E.2d 1196 (Mass. 1995) ...........................................29

*Knowles v. Gilchrist Co.*,
    362 Mass. 642, 289 N.E.2d 879 (1972) ..............................................19

*Kuan Chen v. U.S. Sports Acad., Inc.*,
    956 F.3d 45 (1st Cir. 2020)...........................................................1

*Magee v. Scott*,
    63 Mass. 148 (1851) ...................................................................46

*Maurer v. Indep. Town*,
    870 F.3d 380 (5th Cir. 2017) ........................................................44

*McCarthy v. Tobin*,
    429 Mass. 84 (Mass. 1999) ...................................................... 36, 37

*Metropolitan Life Insurance Company v. Beard*,
    No. 16-11782-PBS, 2019WL480513 (D. Mass. Feb. 7, 2019) ...........................39

*Muller Boat Works, Inc. v. Unnamed 52' House Barge*,
    464 F. Supp. 2d 127 (E.D.N.Y. 2006) ................................................29

*Nortek, Inc. v. Liberty Mutual Insurance Company*,
    65 Mass. App. Ct. 764 (2006)........................................................36

*People Source Staffing Professionals v. Robertson*,
    Case No. 21-30368 (5th Cir. Aug. 25, 2022) .........................................44

*Pérez-Cordero v. Wal-Mart P.R., Inc.*,
    656 F.3d 19 (1st Cir. 2011)..........................................................17

*Polaroid Corporation v. Rollins Env't. Serv. (NJ)*,
    416 Mass. 684 (1993) ................................................................37

*Preston v. Prather*,
    137 U.S. 604, 11 S. Ct. 162, 34 L. Ed. 2d 788 (1891).................................32

*Rev-Lyn Contracting Co. v. Patriot Marine, LLC, C.A.*,
    No. 08-10310-RGS (D. Mass. Dec. 9, 2010) ..........................................30

*Sawtelle v. Farrell*,
    70 F.3d 1381 (1st Cir. 1995)..........................................................1

*Smith v. Marcus & Millichap, Inc.*,
    991 F.3d 1145 (11th Cir. 2021) ......................................................45

*Staniewicz v. Beecham, Inc.*,
  687 F.2d 526 (1st Cir. 1982).................................................................42

*Stuart v. D.N. Kelley & Son*,
  331 Mass. 76, 117 N.E.2d 160 (1954).................................... 19, 29, 32

*Sullivan v. O'Connor*,
  81 Mass. App. Ct. 212 ................................................................. 38, 39

*T.F. v. B.L.*,
  442 Mass. 522 (2004) ................................................................39

*Taite v. Bridgewater State Univ.*,
  999 F.3d 86 (1st Cir. 2021)................................................................17

*United States v. Daneshvar*,
  925 F.3d 766 (6th Cir. 2019) ................................................................42

*Valedon Martinez v. Hospital Presbiteriano de la Comunidad, Inc.*,
  806 F.2d 1128 (1st Cir. 1986)................................................................18

*Vita v. Berman, Devalerio & Pease,. LLP*,
  81 Mass. App. Ct. 748 (2012)................................................................39

*Warren v. Ball*,
  341 Mass. 350, 170 N.E.2d 341 (1960)..................................... *passim*

*Weiser v. Lane*,
  244 Mass. 340, 138 N.E. 391 (1923)................................................................19

*Wilson v. Bradlees of New England, Inc.*,
  96 F.3d 552 (1st Cir. 1996)................................................................16

## Statutes and Other Authorities:

26 U.S.C. § 501(c)(3)................................................................2

28 U.S.C. § 41 ................................................................3

28 U.S.C. § 1291 ................................................................2

28 U.S.C. § 1332 ................................................................1

28 U.S.C. § 1332(a)(2)................................................................2

9 S. Williston, Contracts § 1030 (3d ed. 1967)................................................................29

Danielle D'Onfro, *The New Bailments,* 97 WASHINGTON L. REV. (2022) ..............31

Fed. R. App. P. 3 ...........................................................................................3

Fed. R. App. P. 4 ...........................................................................................3

Fed. R. App. P. 29(f)(1) ................................................................................3

Fed. R. Civ. P. 56 ........................................................................................43

Fed. R. Civ. P. 56(c)(2) ......................................................................... 43, 44

Fed. R. Civ. P. 803(6) ............................................................................ 42, 43

Fed. R. Evid. 801(c)(2) ...............................................................................42

Fed. R. Evid. 803(6) ............................................................................... 42, 45

Mass. Gen. Laws ch. 106, § 2-201 ...........................................................30

Mass. Gen. Laws ch. 223A, § 2 ..................................................................1

Mass. Gen. Laws ch. 260, § 2 ............................................................ 17-18, 19

Mass. Gen. Laws ch. 260, § 2A .......................................................... 17, 18

Restatement (Second) Contracts, Section 24 (1981) .............................37

# APPELLANT'S BRIEF

Gibson Foundation, Inc. ("Gibson Foundation") files its Appellant's Brief and states:

## JURISDICTIONAL STATEMENT

*District Court Jurisdiction*. Gibson Foundation (Plaintiff and Counterclaim Defendant below) appeals from a judgment rendered by the United District Court for the District of Massachusetts, Boston Division (the "District Court"), the Honorable Indira Talwani (the "Trial Judge") presiding. A842-844. The District Court exercised personal jurisdiction over all parties as they either are residents of Massachusetts, have their principal place of business in Massachusetts, or have regular and systematic contacts with Massachusetts, including contacts involving the conduct from which the case arises. *See, e.g., Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 (1st Cir. 2016) (Federal court sitting in diversity exercises personal jurisdiction coextensive with that of the forum state, citing *Sawtelle v. Farrell*, 70 F.3d 1381, 1387 (1st Cir. 1995)); Mass. Gen. Laws ch. 223A §2 ("A court may exercise personal jurisdiction over a person domiciled in, organized under the laws of, or maintaining his or its principal place of business in, this commonwealth as to any cause of action."); and *Kuan Chen v. U.S. Sports Acad., Inc.* 956 F.3d 45, 55-56 (1st Cir. 2020) (overview of personal jurisdiction over out-of-state entity with contacts in or to the forum state). The District Court exercised subject matter jurisdiction over the claims and counterclaims under 28 U.S.C. §1332

as there exists complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00 in value. 28 U.S.C. §1332(a)(2); *see generally Hertz Corp. v. Friend,* 130 S.Ct. 1181, 1185-94, 175 L.Ed.2d 1559 U.S. 77 (2010) (reviewing origin and development of diversity jurisdiction).[1]

The Final Judgment generally favored Appellees and Defendants/Counterclaimants below Rob Norris ("Norris") and The Piano Mill Group, LLC ("Piano Mill"). Norris is an individual domiciled in Massachusetts. A27. Piano Mill is a Massachusetts Limited Liability Company with its principal place of business in Massachusetts. A27. Gibson Foundation is a Delaware corporation operating as a charitable foundation pursuant to 26 U.S.C. §501(c)(3) with its principal place of business in Nashville, Tennessee. A26. The subject matter of the dispute is the ownership of a historic, customized Baldwin piano regularly played by famed American pianist Liberace (the "Piano").[2] A28. The value of the Piano well exceeds $75,000.00. A28.

*Appellate Jurisdiction.* This is an appeal from a final judgment rendered by a district court within the First Circuit's assigned geography. 28 U.S.C. §1291 ("The courts of appeals … shall have jurisdiction of appeals from all final decisions of the

---

[1] Gibson Foundation notes that it pled facts supporting diversity jurisdiction that defendants/appellees never challenged. A27.

[2] More specifically, the Piano is Baldwin SD10B model Piano, serial number 255848 (the "Piano"). A307-308.

District Courts of the United States …except where a direct review may be had in the Supreme Court.); 28 U.S.C. §41 (Massachusetts assigned to the First Circuit).

*Timeliness of Appeal and Brief.* The District Court entered the Final Judgment, the order appealed from, on October 24, 2022. ADD19-21. Gibson Foundation filed its Notice of Appeal in the District Court on October 28, 2022. A845-846. Thus, Gibson timely perfected its appeal. Fed. R. App. Proc. 3 & 4 (Rule 4 requiring the Notice of Appeal described in Rule 3 to be filed with the clerk of the District Court issuing the judgment within 30 days of that judgment). The District Court provided the complete record on February 14, 2023 and this Court ordered Gibson Foundation to file its brief on or before March 27, 2023. First Circuit DKT # 9 in Case No. 22-1837 (1st Cir.). Gibson Foundation files this brief on March 27, 2023, before the deadline set by the Court. Thus, Gibson Foundation timely filed its brief. Fed. R. App. P. 29(f)(1) (time for filing appellant brief is 40 days after the record is filed).

*Appeal From a Final Judgment.* Gibson Foundation appeals from the District Court's Final Judgment. A845-846. By its express terms that Final Judgment disposed of all claims and defenses in the case. A842-844 (dismissing all claims asserted by Gibson Foundation, declaring that Gibson Foundation has no right of possession to the Piano, dismissing all claims asserted by Norris and Piano Mill other

than those withdrawn, denying all further relief and noting "This is a Final Judgment, subject to appeal.").

## STATEMENT OF THE ISSUES

1. Whether the District Court erred in ruling on summary judgment that the Massachusetts Statute of Limitations barred Gibson Foundation's contract-based claim against Norris and Piano Mill for return of the Piano.

2. Whether the District Court erred in ruling on summary judgment that Gibson Foundation failed to present evidence specific enough to establish a bailment agreement with Norris and/or Piano Mill.

## STATEMENT OF THE CASE

*The Parties.*[3] Gibson Foundation operates as the charitable arm of Gibson Brands, Inc. ("Gibson Brands"). A265. Gibson Brands primarily manufactures and sells its iconic guitars, but as the company's name suggests, Gibson Brands also operates several other lines of musical instruments and accessories. Included among those "other lines" are Baldwin Pianos. More specifically, Gibson Brands purchased the assets of the Baldwin Piano and Organ Company in a 2001 bankruptcy sale. As a result of that sale, Gibson Brands acquired possession of the Piano. A347-350.

---

[3] Gibson Foundation notes that its recitation of the factual background derives from the evidence before the District Court on summary judgment. Importantly, Norris raised no objections to the cited evidence and the District Court did not indicate that it viewed any of the evidence inadmissible.

Norris owns and operates Piano Mill. Piano Mill sells pianos on a retail basis as well as servicing pianos and offering a location for piano lessons. Over time Norris has used different corporate entities to conduct Piano Mills' business as well as operating Piano Mill as a sole proprietorship doing business. At all relevant times, Norris and Piano Mill were authorized retail sellers of Baldwin Pianos. *See generally* A27, A36.

*The Piano*. The Piano at issue is a Baldwin Model SD-10, 9-foot grand piano constructed for Liberace, bearing serial number 255848. There were two such Baldwin pianos. Of note, the Piano is visually distinctive and readily identifiable with Liberace based on the approximately 10,000 rhinestones that adorn the Piano. A307-316.

*The Transfer of the Piano*. On June 20, 2011, Tom Dorn, an employee responsible for the distribution of Baldwin Pianos to authorized retailers, reached out to several of those piano retailers, including Norris, on a group email. A362. Mr. Dorn's self-evident purpose for the email was to find a retailer willing to wholesale purchase either or both of two recently available new Baldwin Grand pianos. A362. Norris immediately responded to the Dorn email, first noting that he lacked the financial wherewithal to purchase a new Baldwin grand piano for resale at Piano Mill. A362 ("Unfortunately I am not currently in a position to shell out the 30K to purchase one outright."). Norris, however, indicated a desire for a "creative

arrangement" with Baldwin, touting the connections available to his partner Amanda Carr, implying Ms. Carr could garner publicity for Baldwin if she had the right piano to use and showcase. A362. Norris' email to Dorn plainly expressed that Norris was not seeking to buy a piano; instead, the discussion was of the opportunities Ms. Carr's connections could present was in the context of a loaned instrument to be used for promotional opportunities. A362 ("Piano Mill would still very much like to have a Baldwin concert grand for symphony rentals and *promotional opportunities*." (Emphasis added)).

Dorn forwarded Norris' request to Jim Felber, a Gibson Brands' entertainment relations employee. A353. Felber responded to Dorn with the possibility of placing the Piano with Norris in a long-term loan. A352-353. Importantly, Dorn made clear that (at least internally in the Baldwin/Gibson organization) this discussion was for the *loan or bailment* of the Piano:

> I don't know of a Piano Dealer in the country that could afford to buy a Liberace piano, plus it is my understanding that Baldwin USA is unable/unwilling to sell anything at this time (per the CEO). However, if you simply need a place to put a Liberace, almost every Baldwin dealer would be happy to store it for you. Back in 2002 we did a wonderful tour of one of those pianos and generated a lot of publicity and piano business with it.

A352. Felber then confirmed that the internal discussions were about the loan or bailment of the Piano rather than some sort of permanent transfer to Norris:

> That's what I meant-just as a showroom piece? Long term
> loan that IF a fil (*sic*) or something needed it they cam (*sic*)
> borrow it-if it helps you they just need to pay cartage and
> come and get it-It has a nice flight case and its sister piano
> appeared in (*sic*) Grammys.

A352.

Having received the go ahead from Felber, Dorn offered the Piano to Norris. On June 28, 2011, Felber sent an email to Dorn and Norris to arrange transfer of possession of the Piano. A355. Once again, it was clear from Felber's email that the transfer to Norris was not permanent as Felber told Norris "thanks for housing it." A355. Although the initial "it's a loan" email was an internal communication between Felber and Dorn, the email referencing "housing" the Piano included Norris as a recipient. A355. By July 14, 2011, the Piano was at Piano Mill. A356.

In his email confirming that the Piano was safely with Piano Mill, rather than correcting the record about his alleged ownership of the Piano as opposed to his "housing" it, Norris described the condition of the Piano, its intended uses, and *asked for permission to conduct repairs on the Piano*. A356 ("Is it okay to make some cosmetic repairs as well as do some fine regulation to the action?). In reply, Felber approved the repairs. A356.

*Piano Mill's Possession of the Piano.* For the next three and a half years, the Piano stayed with Piano Mill. In May of 2013, Boston.com published a story about the Piano and its use as a promotional tool for the Liberace biopic *Beyond the*

*Candelabra.* The publication interviewed Norris and reported his description about possession of the Piano as follows:

> "I am the indefinite custodian of it," Norris told [Boston.com] Monday. "A few years ago, my Baldwin rep called me and said they needed a home for it, so I have it."

A295-296.

Catastrophe struck Piano Mill in February 2015 as the build-up of snow from a storm cratered the roof of Piano Mill's building. A357-359 (with thread beginning on A359). On learning of the disaster, Dorn reached out to Norris to ask about the condition of the Piano and to inform him that Gibson Brands wanted the Piano returned for its own promotional opportunity. A359. Norris responded that the roof collapse did not damage the Piano and that the Piano was available for pickup at Gibson Brand's convenience. A358-359 ("[The Piano] is safe and sound and I will leave it on piano board if there are plans to pick it up. (Flight case is currently buried and my guess is not salvageable).").

Norris followed that email with another, this time wondering whether Gibson Brands would auction the Piano and donate the proceeds to Piano Mill as a disaster relief promotion:

> Would the folks at Gibson be willing to have the Liberace auctioned off with proceeds donated to Piano Mills reconstruction and restoration of all the other pianos. There will probably never be a better time for this considering all the national press and it sure would be great press for Gibson.

8

> I'd like to know your thoughts or even if you think I should present this to someone within Gibson.

A357-358. On February 12, 2015, Dorn responded to Norris that he would pass along Norris' auction idea to the Gibson Brands entertainment relations department, but that he doubted that Gibson Brands would say yes. A357. Dorn mentioned the value of the instrument and Gibson Brand's wish to use the Piano for Gibson Brands' own promotional opportunities. A357. In a reply email, Norris did not register any disagreement with the idea that the Piano belonged to Gibson Brands. A357.

*The Dispute Arises.* About a month later, late in the afternoon of March 13, 2015, Norris sent another email to Dorn.[4] A360-361 (with email thread beginning on A361). In the March 13, 2015, email, Norris indicated that Piano Mill could not loan out the Piano as the Piano was being held for a fundraising effort. A361. Dorn immediately responded that Piano Mill had no right to make this decision as the Piano belonged to Gibson Brands. A360. On March 17, 2015, Norris replied with the assertion that Piano Mill now owned the Piano. A360.

Norris' new theory that he now owned the Piano was contrary to everything that had preceded it. To recap the contrary evidence:

---

[4] This email appears to be a follow-up to an email that was lost or to a phone call, text, or some other sort of communication from Dorn. Specifically, the March 13, 2015, Norris email is not part of the same e-mail chain as above.

- The arrangement began when Norris asked to use—not buy—a piano for promotional opportunities. A362.

- The internal discussions at Gibson Brands and Baldwin demonstrated an intent to loan, rather than give, Norris the Piano. A352-354.

- The communication from Gibson Brands and Baldwin to Norris when Norris took possession of the Piano thanked Norris for "housing" the Piano was consistent with the internal discussions. A355.

- Rather than object to the "housing characterization," Norris raised no objection, instead asking permission to conduct repairs on the Piano. A356.

- Norris' comments to third-parties, presumably with the knowledge that the comments would be widely published, were not that Norris owned the Piano, but that Norris was the "indefinite custodian" of the Piano, and he was housing the Piano. A295-296.

- At the time of the roof catastrophe Norris first made clear that Gibson Brands could take the Piano back and then he asked that Gibson Brands auction the Piano and donate the auction proceeds to him. A357-359.

- The Piano is an undeniably valuable asset, both financially and culturally. There exists no commonsense rationale for why Gibson Brands would give the Piano away to anything other than a charity. A357.

Against these four years of repeated communications in which Norris acknowledged Gibson Brands' ownership of the Piano, Norris based his new contention that Gibson Brands gave him the Piano on one alleged oral conversation between he and Felber in which Felber supposedly said the Piano "was all [Norris'] if he came and got it." A357. Notably, Norris delayed making any reference to the

alleged offer of a gift from Felber until it was clear that Gibson Brands would not be donating the Piano to help Norris defray the storm costs. A357.

*The Dispute Matures Into A Lawsuit.* Gibson Brands filed for bankruptcy protection and emerged with new ownership in November, 2018. On November 11, 2019, Gibson Brands conveyed its rights in the Piano to Gibson Foundation. A399-400. The conveyance of the Piano to Gibson Foundation came against a backdrop of "back and forth" settlement demands and responses with Norris. A317-340. That back and forth demonstrated the parties could not reach an amicable agreement. A317-340. On April 7, 2020, Gibson Foundation filed suit in the United States District Court, Middle District of Tennessee, Nashville Division. A5. Norris successfully challenged the venue of the action, causing the case's transfer to the District of Massachusetts. A7.

*The Summary Judgment Motions.* The parties filed cross-motions for summary judgment. A15-16. By the time of the summary judgment motions, the pleadings included the following claims and legal theories. Gibson Foundation's live complaint alleged that Norris' and Piano Mill's refusal to relinquish the Piano: (1) breached a contract; (2) violated a bailment agreement; and (3) constituted a conversion. A26-34.

In response to Gibson Foundation's claims and relevant to the District Court's eventual ruling, Norris and Piano Mill denied that any agreement existed under

which Gibson Brands or its assignee, Gibson Foundation, retained ownership of the Piano. A35-58. Norris and Piano Mill asserted an affirmative defense of limitations. A35-58. Pleading further, Norris and Piano Mill sought a declaratory judgment and/or "equitable order" that it or they owned the Piano. A35-58. Finally, Norris and Piano Mill asserted an abuse of process claim based on alleged frivolous and vexatious litigation. A35-58.

Gibson Foundation's summary judgment motion argued that the undisputed facts demonstrated a bailment arrangement based on an express contract between Gibson Brands and Norris/Piano Mill under which Norris and Piano Mill held the Piano for Gibson. A257-283. Alternatively, Gibson Foundation argued that the same undisputed facts revealed an implied-in-law or implied-in-fact contract to the same effect, specifically a bailment. A257-283. Gibson Foundation's summary judgment motion also contended that the Norris/Piano Mill abuse of process, declaratory judgment and equitable relief counterclaims failed as a matter of law. A257-283.

Norris and Piano Mill's Summary Judgment motion only attacked Gibson Foundation's claims as to Gibson Foundation's right to the Piano. A69-83. In other words, Norris and The Piano Mill did not move for summary judgment that the Court should declare it or they the sole owner of the Piano; the Court should award it or they the Piano as a form of equitable relief; or that the Court should find an abuse of process as a matter of law. On each of the three ownership claims (conversion,

regular contract, and bailment) Norris and Piano Mill contended that Gibson Foundation "could not establish" that Gibson Brands had owned the Piano. A69-83. In addition, Norris and Piano Mill argued the limitations barred the conversion claim as a matter of law and on the contract and bailment claims Gibson Foundation could not establish an agreement definitive enough to enforce. A69-83.

*The District Court Summary Judgment Ruling and Final Judgment.* On May 25, 2022, the District Court entered its opinion as to the summary judgment motions and an order based on that opinion. ADD1-18. The District Court granted Gibson Foundation's summary judgment motion only as to Norris' and Piano Mill's abuse of process claim.[5] ADD1-18. The District Court granted all three components of Norris' and Piano Mills' summary judgment motion finding that: (1) the applicable Massachusetts statute of limitations barred both the conversion and breach of bailment claims; and (2) Gibson Foundation had not offered evidence from which a fact finder could determine the material terms of a contract or "warehousing agreement." ADD1-18. The District Court did rely on Norris' and Piano Mills' theory that Gibson Foundation could not prove Gibson Brands' ownership of the Piano prior to the transfer of possession. ADD1-18.

---

[5] Based on the absence of a cross appeal, Gibson Foundation assumes that Norris and the Piano Mill do not complain about the District Court's dismissal of their abuse of process claim.

The District Court's ruling and order left in place Norris' and Piano Mills' claims for declaratory judgment and equitable relief. ADD1-18. The parties attempted to prepare for trial on those issues. In the pre-trial conferences, however, the District Court and Gibson Foundation repeatedly expressed concern as to whether the remaining claims offered any avenue to viable relief above and beyond what the District Court had already granted. A743-834. Eventually Norris and Piano Mill voluntarily dismissed without prejudice to refiling the remaining claims for declaratory judgment and equitable relief. A835-841. The District Court then entered Final Judgment based on its summary judgment opinion and order. ADD19-21.

## SUMMARY OF THE ARGUMENT[6]

The case is about two legal interpretations of facts that are only lightly disputed. Gibson Foundation sees the transaction as a loan or bailment of the Piano from Gibson Brands to Norris and Piano Mill. The loan of the Piano was for an indefinite time during which Norris and Piano Mill received the consideration of substantial publicity and marketing opportunities while Gibson Brands gained storage for a valuable asset, avoided moving costs for that asset, promoted the Baldwin brand, and strengthened a relationship with one of its dealers. In this light,

---

[6] Gibson Foundation does not appeal the District Court's ruling that the Massachusetts' Statute of Limitations bars Gibson Foundations' conversion claim or that the District Court erred in denying Gibson Foundation's Motion for Summary Judgment that it had proved conversion, violation of a bailment or breach of contract as a matter of law.

the arrangement would be appropriately characterized as a bailment. Norris and Piano Mill, relying entirely on Norris' characterization of one fleeting conversation with Felber to which Norris is the sole self-interested witness, sees the transaction either as an outright gift from Gibson Brands or a completed oral contract, the terms of which were the conveyance of the Piano's ownership in return for moving the Piano from its then location.

The District Court's summary judgment erred in two vital ways. First, the statute of limitations does not bar Gibson Foundation's bailment claim. The bailment at issue arises from an agreement, either expressed or implied. Massachusetts law is clear that a six-year limitations period applies to that type of bailment theory. Second, competent summary judgment evidence raised genuine issues of material fact on each element of Gibson Foundation's bailment or contract theories.

## ARGUMENT AND AUTHORITIES

### I.      Summary Judgment Standard and Standard of Review.

This brief asks the Court to address two types of summary judgment theories. First, Norris and Piano Mill argued that, as a matter of law, the statute of limitations bars Gibson Foundation's bailment claim. Gibson Foundation agrees that the facts as to when it discovered its potential claim and when it filed the lawsuit are undisputed. Specifically, Gibson first discovered that Norris and the Piano Mill

refused to return the bailed item (The Piano) on March 13, 2015, when Norris emailed Dorn that refusal. A357-359. Gibson Foundation filed suit on April 7, 2020.

The question on the limitations issue is whether the District Court correctly applied the law to these undisputed facts. Thus, limitations is a purely legal issue; the District Court just resolved that issue incorrectly. *See generally, Basic Controlex Corp. v. Klockner Moeller Corp.*, 202 F.3d 450, 453-54 (1st Cir. 2000) (affirming summary judgment analysis of statute of limitations issue). Inferences and credibility determinations are irrelevant; all that matters is the District Court's legal analysis. This Court reviews that analysis *de novo*, giving no deference to the Trial Judge's reasoning. *Wilson v. Bradlees of New England, Inc.*, 96 F.3d 552, 554 (1st Cir. 1996).

Second, as the non-movant, Norris' and Piano Mill's summary judgment called Gibson Foundation to make a sufficient showing on any essential element of the plaintiff's case that Norris and Piano Mill challenged. *Katz v. Belveron Real Estate Prtnrs, LLC*, 28 F.4th 300, 307 (1st. Cir. 2022) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). To defeat this type of summary judgment, Gibson Foundation need not conclusively prove the existence of and the breach of a bailment relationship or contract. Instead, it must only show a genuine dispute over the material facts using the following rubric:

> A dispute is "genuine" if the evidence "is such that a reasonable jury could resolve the point in the favor of the

non-moving party [Taite]," *Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1, 7 (1st Cir. 2018) (citation omitted), and a fact is "material" if it "has the potential of affecting the outcome of the case," *Pérez-Cordero v. Wal-Mart P.R., Inc.*, 656 F.3d 19, 25 (1st Cir. 2011) (citation omitted). When determining if a genuine dispute of material fact exists, "we look to all of the record materials on file, including the pleadings, depositions, and affidavits" without evaluating "the credibility of witnesses [ ]or weigh[ing] the evidence." *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014).

*Taite v. Bridgewater State Univ.*, 999 F.3d 86, 93 (1st Cir. 2021). In the analysis of record, the Trial Judge must view the underlying evidence in the light most favorable to Gibson Foundation, indulging any rational inference in its favor. On appeal, this Court must do the same as its review of the second set of issues is also *de novo*. *Hosp. San Antonio, Inc. v. Oquendo-Lorenzo*, 47 F.4th 1, 6 (1st Cir. 2022); and *Barth v. City of Cranston*, 44 F.4th 65, 68-69 (1st Cir. 2022) (record reviewed in favor of the non-movant.).

## II.    The District Court Erred in Ruling on Summary Judgment that the Massachusetts Statute of Limitations Barred Gibson Foundation's Contract-Based Claims Against Norris

### A.    Legal Standard.

There is no specific statute of limitations for a bailment action brought in Massachusetts. Instead, Massachusetts has general statutes imposing a three-year limitations period for tort actions and a six-year limitations period for contract actions. *Compare* Mass. General Law Ch. 260 §2A (torts and Mass. General Law

Ch. 260 §2 (contracts)). The District Court found that the Massachusetts statute of limitations for torts applied, barring Gibson Foundation's claim as it was brought more than three years after a cause of action accrued to Gibson Brands. ADD12-13 (applying Mass. General Law Ch. 260 §2A). The crux of the District Court's decision comes from the conclusion that a bailment action can *only* be considered the functional equivalent of a conversion or replevin claim and is therefore a tort. ADD12-13 (citing *Aimtek, Inc. v. Norton Co.*, 69 Mass. App. Ct. 660, 663, 870 N.E.2d 1114 (2007) (collecting cases); *Atlantic Fin. Corp. v. Galvam,* 311 Mass. 49, 50, 39 N.E.2d 951 (1942) ("A bailor entitled to possession may maintain an action for conversion"); and *Warren v. Ball,* 341 Mass. 350, 352-53, 170 N.E.2d 341 (1960) (action for replevin brought to recover bailed goods still held by bailee)).[7]

While the District Court is able, its review and application of the leading case—*Aimtek, Inc. v. Norton Co.*, 69 Mass. App. Ct. 660, 870 N.E.2d 1114 (2007)—is a flat-out miss on the limitations issue. *Aimtek* unambiguously supports the idea that a bailment claim can be viewed as the equivalent of a contract action to which the Massachusetts six-year statute of limitations applies. *Aimtek*, 69 Mass. App. Ct at 666, 870 N.E. 2d at 1120 ("… [W]e agree with the trial judge that the essential

---

[7] The District Court correctly selected Massachusetts law for the limitations analysis as a federal court sitting in diversity must apply the substantive law (including limitations) of the forum state. *See Valedon Martinez v. Hospital Presbiteriano de la Comunidad, Inc.*, 806 F.2d 1128,1133 (1st Cir. 1986).

nature of the bailment claim, as pursued in this case and as ultimately established at trial, was contractual."). Indeed, that result is *Aimtek's* exact and fundamental holding: bailment claims can be contractual in nature and governed by Massachusetts' six-year limitations period. *Id.* ("…[T]he judge was correct in ruling that the six-year statute of limitations for contract actions, G.L. c. 260, § 2, applied . . .."). Moreover, *Aimtek* makes clear that an agreement basis for a bailment claim rather than a tort basis is not novel. *Id.* at *70 N.E.2d at 1118, 69 Mass. App. Ct. at 663 (citing *Weiser v. Lane,* 244 Mass. 340, 341, 138 N.E. 391 (1923) (action in contract brought against hotel, as bailee, for lost luggage); *Stuart v. D.N. Kelley & Son,* 331 Mass. 76, 76, 117 N.E.2d 160 (1954) (action of contract or tort alleging loss from bailment for hire); *Knowles v. Gilchrist Co.,* 362 Mass. 642, 642-643, 289 N.E.2d 879 (1972) (bailor brought "an action of tort and contract" against bailee upholsterer for furniture destroyed by fire).

A comparison of *Aimtek* with the other authority cited by the District Court drives the point home. In *Aimtek*, the alleged bailment arose from the plaintiff's placement of two gas storage tanks at the defendant's facility as part of a contract through which the plaintiff sold to the defendant gasses then stored in defendant's facility. The parties renewed the contract once, but the defendant eventually terminated the contract. Rather than removing the tanks, however, the plaintiff left the tanks at the defendant's facility under an expectation or hope that the gas sales

to the defendant would resume. Plaintiff's theory of the case was that the parties had agreed the defendant could continue to house the tanks. That agreement was allegedly to the mutual benefit of the parties as it allowed the defendant to use the tanks without a rental fee or purchase cost while the plaintiff avoided the cost of removal and improved the possibility of future sales. When those sales did not materialize, plaintiff demanded the return of its tanks. Defendant did not comply, instead "scrapping" the tanks. The suit followed four years after the demand. Like this case, the defendant sought dismissal based on limitations, arguing that "bailment" meant conversion or replevin and the three-year tort-based limitations statue applied. *Id.* 69 Mass. App. Ct at 660-63, 870 N.E. 2d at 1116-18.

As noted, however, *Aimtek* rejected the exact argument that Norris and Piano Mill raise here and did so on highly analogous, if not identical, facts. Just as the *Aimtek* plaintiff loaned the tanks to the *Aimtek* defendant for the parties' mutual benefit, Gibson Brands loaned the Piano to Norris and Piano Mill for an expected mutual benefit. A352-354. In *Aimtek*, there was no applicable written contract, formal agreement, or a moment where the parties had "a meeting of the minds"; instead, a jury was able to use circumstantial evidence to discern the *Aimtek* defendant's participation in the loan of the tanks and the resulting bailment. There is nothing about *Aimtek*'s fact pattern, reasoning, or ultimate result that supports the result the Trial Judge arrived at in the present matter; in fact, the opposite is true—

as a matter of law, the six-year limitations statue should apply to the theory Gibson Foundation wishes to try.

Compare the *Aimtek* fact situation to *Atlantic Fin. Corp. v. Galvam,* 311 Mass. 49, 50, 39 N.E.2d 951 (1942) and *Warren v. Ball*, 341 Mass. 350, 352-53, 170 N.E.2d 341 (1960), the two cases the District Court cites as additional support of its limitations ruling. A13. Most importantly, neither case applied the statute of limitations while *Aimtek* directly addressed the issue.

Contrary to the District Court's implication, *Galvam* does not mandate that bailment claims must framed as conversion or replevin actions; it states that a bailor *may* frame its complaint as a tort or replevin action. *Galvam*, 311 Mass. At 49, 30 N.E. at 951 ("A consignor of goods for sale for his benefit, entitled to immediate possession thereof under the terms of the consignment, *may* maintain an action for their conversion.") (emphasis added). Thus, at most, the cases stand for the proposition that a bailment claim can be equated to a tort or replevin action; but there is nothing about the cases that undercuts *Aimtek's* conclusion that a bailment case can also be framed as a broken promise.

The fact pattern in *Galvam* fundamentally differs from this case. The *Galvam* plaintiff consigned five automobiles to a car lot. The sheriff then attached the cars, as the result of claims against the car lot rather than claims against the plaintiff-consignor. Following the consignors' oral demand and presentation of the

consignment receipt demonstrating the consignor's ownership, the sheriff refused return of the cars to the plaintiff-consignor. At trial the sheriff prevailed under the theory the consignor's demand was inadequate for a conversion case. The Massachusetts Supreme Court reversed, finding that full written demand was only necessary where the defendant's possession of the property was not wrongful. As the cars were not the property of the debtor, the attachment was wrongful, and a conversion case could be had without demand. *Id.,* 311 Mass. at 49-50; 39 N.E.2d at 951. *Galvam* neither limits bailment cases to conversion actions nor discusses which limitations statute should apply. It simply does not stand for the proposition the summary judgment opinion cites it for.

*Galvam's* distinct fact pattern, however, demonstrates why some bailment claims should be considered conversions and other bailments should be considered broken agreements. The consignor-plaintiff in *Galvam* did not know the sheriff-defendant nor have any dealings with him; in fact, the consignor-plaintiff did not deliver the goods to the sheriff. Thus, an agreement-based bailment with the sheriff as bailee was a logical impossibility, so a conversion action based on the idea that the sheriff wrongfully (although likely unintentionally) took another's property was the only logical recourse. Of course, the relationship between Gibson Brands and Norris and Piano Mill was direct, meaning an agreement-based bailment was not only possible, but likely here.

Likewise, *Warren* does more to prove Gibson Foundation's case than rebut it. There, the Town of Warren needed to make room in its town barn and sought to move two old (or antique) fire-fighting tubs. Mr. Ball offered to take them. He did so and refurbished one of the tubs at his cost. Twelve years passed and Ball sought to transfer the tubs to a third party. To accomplish the transfer, Ball asked the town for a bill of sale. The town objected and demanded the return of the tubs. Ball died and his estate defended the action by claiming the absence of a bailment and alternatively, an "unreasonable demand" for the return of the tubs. *Warren,* 341 Mass. at 351-353, 170 N.E.2d at 341-44.

That the town filed a "replevin action" is not central to the case.[8] Instead, the discussion about replevin centers on the defendant's contention that the court should have measured the timeliness of the town's demand for the tubs by the then existing replevin statute of limitations period of six years. *Id. Warren* rejected that theory, sensibly concluding that there are many instances in which possession of property

---

[8] Properly considered, there is no such thing as a pure "replevin case." Recognizing that Massachusetts laws refers to "an action for replevin", it is clear that such an action is not independent, replevin cannot exist without some underlying liability theory. Usually, replevin is a pre-judgment procedure in which an asset is seized pending trial. Regardless of the timing, one cannot have a replevin without either prevailing on a cause of action or demonstrating that one will likely prevail on a cause of action. Thus, replevin is more of a remedy than a cause of action. Here, Gibson Foundation did not plead for replevin and the determination of which remedies might be allowed should not control the determination of whether Gibson Foundation is entitled to any remedy, including damages.

passes to a bailee and the bailor has no reason to demand its return. Thus, *Warren* concludes that arbitrary deadlines for demand of bailed property should be avoided. As an example of the soundness of the Court's reasoning, one only need to look at this case. The "replevin" statute is now at three years, but it was the storm and potential damage three and half years after Norris and the Piano Mill took possession that triggered the demand for return. A357-359. If one assumes a bailment existed, there was no reason to demand return of the Piano before the storm, yet measuring the timeliness of demand by limitations statutes would give possession to Norris and Piano Mill despite a bailment that was carried out according to its terms.

Pertinent to this case, however, is the fact that *Warren* upheld the finding of a bailment for an indefinite time and with indefinite terms. Indeed, in addition to the lack of a time component, there were almost no details to be had about the terms of the bailment other than that Ball would keep the property. Finally, the fact of bailment as opposed to a gift was proven almost exclusively by Ball's statements and actions, specifically that he "would take good care of the [tubs]" and a later statement to a third party that he was doing restoration work on the tubs because "he was preserving something for the town." 341 Mass. at 353, 170 N.E.2d at 344.

Again, *Warren's* important facts parallel this case and should have informed a denial of Norris'/Piano Mill's summary judgment motion. If there need not be the expression of "essential terms" in *Warren* to find a bailment,where did the

requirement arrive from in this case? If the Town of Warren could prove a bailment based on the statements of Mr. Ball to the effect he was a custodian of the fire tubs, what stops Gibson Foundation from proving its bailment theory as agreement based using similar statements from Norris?

In summary, actions for breach of bailment can clearly be actions more suited to a contract statute of limitation than a tort statute of limitation. The leading Massachusetts cases say exactly that and the whole of bailment law routinely recognizes bailments as creatures of agreement, either express or implied. Thus, the District Court erred in dismissing Gibson Foundations' bailment claim based on the Massachusetts three-year tort-based statute of limitations.

### B.    Discussion.

The District Court dismissed Gibson Foundation's bailment action based solely on the statute of limitations. ADD12-13. As shown above, the District Court erred in doing so. If this Court follows *Aimtek* and reverses the limitations ruling, nothing in the summary judgment opinion would prevent Gibson Foundation's bailment claim from preceding to trial. Yet, Norris and Piano Mill complained of, and the Trial Judge ruled that, Gibson Foundation's contract claims failed based on the lack of essential terms. ADD13-16. Further, the Trial Judge commented on the potential lack of evidence showing that Gibson Brands ever owned the Piano. ADD2-3.

In that scenario, the Court has three options. First, the Court could remand the case for trial on the bailment claim for further proceedings without addressing Norris' and Piano Mills' other challenges to the bailment action, therefore giving the Trial Judge an opportunity to fully develop the record on that point. Second, the Court could review the summary judgment record and find a genuine issue of fact(s) on the contract claim and remand for trial, essentially instructing that there should be a trial on whether a bailment existed. Third, the Court could determine from the summary judgment record that as a matter of law no bailment existed and render judgment on the bailment claim on grounds different than the District Court. *See generally Austell v. Sprenger,* 690 F.3d 929 (2nd Cir. 2012) (describing limited circumstances in which upholding summary judgment on grounds not relied on is appropriate). A careful examination of the record compels, at least, a remand for trial.

      i.      **Evidence on the Record Supports A Finding That Gibson Brands, and then Gibson Foundation, Gave Temporary Possession, But Not Title or Ownership, of the Piano to Norris and Piano Mill for an Indefinite Period.**

Gibson Foundation's theory is both simple and supported by evidence in the summary judgment record. In summary, Gibson Brands gave temporary possession, but not title or ownership, of the Piano to Norris and Piano Mill for an indefinite period. Gibson Brands retained the right to reassert its dominion over the Piano at any time. This arrangement benefitted Gibson because it saved on removal and

storage costs and resulted in active promotion of the Baldwin brand. The arrangement helped Norris and Piano Mill by generating publicity for Piano Mill. When Gibson Brands transferred ownership of the Piano to Gibson Foundation, it transferred its rights in this arrangement to Gibson Foundation, as well.

Abundant and powerful evidence described in the factual background of this brief supports Gibson Foundation's theory. First, the transfer of the Piano resulted from a request by Norris. A362. The salient feature of Norris' request was that he was not looking to own a new piano: he could not afford it. A362. Instead, Norris specifically spoke to the promotional opportunities he could generate with the right instrument. A362. Second, the internal communications between Gibson/Baldwin representatives at the time of the offer and transfer leave no doubt that Gibson Brands intended the Piano to be on loan to Norris and The Piano Mill, subject to the needs of Gibson Brands. A352-354. Third, Norris' report on the condition of the Piano after he transported it and particularly Norris' request to repair the Piano are clear admissions that he did not own the Piano. A356. Fourth, when given the opportunity Norris' description of his relationship to the Piano as its "indefinite custodian" was a textbook legal description of a bailee. A295-296. Fifth, Norris' offer to let Gibson Brands retake possession of the Piano after the roof collapse evidenced his understanding that he did not own the Piano. A358-359. Sixth, Norris has admitted that no written transfer of ownership exists, even though the Piano is

valued over the $500 required by the statute of frauds. A357. Seventh, and most tellingly, when Norris surfaced the idea of Gibson Brands selling the Piano years after he took possession of it, Norris admitted that it was Gibson Brands' asset to sell, not his. A357-358.

Individually, each of these events or statements are powerful indicators that Norris understood neither he nor Piano Mill owned the Piano. To put it bluntly, why would the owner of a Piano ask for permission to repair it or auction it? Why would he make it available for pickup by the former owner with no questions asked? Combine these undisputed facts and the factual conclusion that Norris—and by extension Piano Mill—knew the Piano was not theirs becomes inescapable; certainly if one indulges all inferences from those facts in Gibson Foundations' favor, there is, at least, genuine issues as to whether the parties meant the conveyance of the Piano to be a loan or a permanent transfer. The legal issue is whether this intent translates to a "bailment."

ii. **Massachusetts Law Supports A Finding that A Bailment Agreement Existed Between Gibson Brands, On The One Hand, and Rob Norris and/or Piano Mill, On The Other Hand.**

The Massachusetts Supreme Court defines the key phrase: "A bailment is established by 'delivery of personalty for some particular purpose, or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with

according to his directions, or kept until he reclaims it, as the case may be.'" *King v. Trustees of Boston Univ*., 420 Mass. 52, 59, 647 N.E.2d 1196, 1201 (Mass. 1995) (citing 9 S. Williston, Contracts § 1030 (3d ed. 1967), internal quotations summarized by Williston omitted); *see also e.g., D.A. Schulte, Inc. v. North Terminal Garage Co*., 197 N.E.16, 19 (Mass. 1935) ("A bailment is essentially a consensual contract arising out of a contract express or implied…and there must be acceptance by the bailee before there can be any bailment."); *Stuart v. D.N. Kelly & Son*, 117 N.E.2d 160, 162 (Mass. 1954), *accord*, *Aegis Investigative Grp. v. Metro. Gov't of Nashville & Davidson Cnty.*, 98 S.W.3d 159, 162-63 (Tenn. Ct. App. 2002) (also adopting Williston definition); and *Muller Boat Works, Inc. v. Unnamed 52' House Barge*, 464 F. Supp. 2d 127, 147 (E.D.N.Y. 2006) (A bailment is "the delivery of goods by their owner to another for a specific purpose, and the acceptance of those goods by the other, with the express or implied promise that the goods will be returned after the purpose of the delivery has been fulfilled.") (quoting *Goudy & Stevens, Inc. v. Cable Marine, Inc*., 924 F.2d 16, 18 (1st Cir. 1991)).[9]

---

[9] The alleged bailment occurred between residents of Tennessee (Gibson Foundation) and Massachusetts (Norris/Piano Mill), with the property delivered in New York and stored in Massachusetts. Unlike the limitations issue, there is a possibility that Massachusetts choice of law rules could compel a diversity court to apply the law of a different forum. Luckily, however, the bailment law of the three states with an interest in the transaction appears to be in accord and therefore there is no choice of law issue. Thus, most citations are to Massachusetts law with occasional references to New York and Tennessee law in support.

From this universally accepted definition, several things become clear. First, bailments often arise despite the absence of a formal written agreement.[10] *See Rev-Lyn Contracting Co. v. Patriot Marine, LLC, C.A.* No. 08-10310-RGS, P.9 (D. Mass. Dec. 9, 20100 (unpublished) ("Although no written agreement covered the hire of Big Toot, Patriot Marine is liable to Rev-Lyn under the law of bailment . . .."). Indeed, a bailment exists even if the parties make *no* agreement about the terms under which the prospective bailee possesses the property. For instance, one roommate asks another "Can I borrow your car?" The roommate receiving the request throws the requestor the keys, who then leaves.

When we will the car be returned? How will the friend making the request compensate his roommate for the use of the car? Is there a limitation on the use of the car during the loan? The roommates cannot answer any of these questions based on their conversation, but the transaction unquestionably creates a bailment. *Cf. Drescher v. Traveler's Ins. Co.,* 359 Mass. 458, 460-62, 269 N.E.2d 651, 653-54 (Mass. 1971) (distinguishing between operation of car within the purposes of a defined bailment and the general use of a car in an undefined bailment); *Commodore*

---

[10] To the contrary, the Massachusetts Statute of Frauds requires any transfer of ownership in property worth $500 or more to be a written agreement. *See* Mass. Gen. Laws ch. 106, § 2-201 ("a contract for sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought [.]").

*Leasing Inc. v. Metropolitan Comm'n.,* 16 Mass. App. Ct. 266, 450 N.E.2d 1097, 1099-1100 (Mass. App. 1983) (holding that surrender of control of car, often including relinquishment of keys, is central to establishing a bailment), Thus, while the absence of "definitive terms" might have some bearing on a contract analysis, the lack of a precise agreement does not bar a bailment claim. In that regard, Gibson Foundation notes that the absence of standards of care and insurance requirements during the bailment is to be expected. The whole point of bailment law is to provide standards of care and assign risks of loss where the parties do not have an express agreement on those terms. Danielle D'Onfro, *The New Bailments,* 97 WASHINGTON L. REV., 97, 103 (2022).

Professor D'Onfro's work focuses on how bailment might apply to digital assets. In introducing the topic, however, she does a stellar job in illuminating why bailment law exists and how it has developed. While the whole introduction is invaluable to understanding the subject matter, her summary is particularly on point:

> A few themes animate the heart of bailment doctrine. The first is that trust is the lifeblood of the bailment relationship. The second is that bailment is a mandatory doctrine—courts will look through contracts to the facts to determine whether a bailment exists. And the third, is that the bailment doctrine puts liability on the least cost avoider, especially in cases where the bailee has a significant informational advantage over the bailor.

*Id.*

Second, the recipient of the property does not need to benefit from possession for a bailment to exist. *Preston v. Prather*, 137 U.S. 604, 612, 11 S.Ct. 162, 34 L.Ed. 2d 788 (1891) (recognizing the concept of a "gratuitous bailment"). The import of this idea is that if there is no benefit to a gratuitous bailee, there can be no contract because one party receives no consideration. Yet, the bailment still exists. It is not consideration that is essential for a bailment, but willing acceptance of the bailed item. *See Stuart v. Kelley & Son*, 331 Mass. 76, 78-79, 117 N.E.2d 160, 163 (Mass. 1954) (lack of knowledge of the bailed item was essential finding negating a finding of gratuitous bailment). Third, and as detailed above in the *Warren v. Ball* case, the key proof of a disputed bailment usually derives from the actions or statements of the purported bailee.

Using these principles and giving every inference and benefit of the doubt to Gibson Foundation at least raises a fact issue on each element of bailment. First, was there "personalty?" Yes, the Piano was personalty. Second, was the personalty delivered to the putative bailee? Yes, on July 14, 2011, Norris and Piano Mill took possession of the Piano. A356. Third, was the transfer of possession to Norris and Piano Mill for "a particular purpose?" Yes, for a new storage "home" and Norris'/ Piano Mills' use to publicize their business. A352-354. Fourth, was there a contract express or implied? Yes, the loan was to be for an indefinite time and subject to Gibson Brands' need for the Piano. A352-354. Fifth, was there a request by the

bailor for return of the property? Yes, there were repeated requests, demands and now this suit. A317-340, A357-359, A360-361.

The facts of personalty, delivery, and demand for return seem to be undisputed. Gibson Foundation realizes that Norris and Piano Mill deny the idea of an agreement in the form of an indefinite loan. But the only question on summary judgment and now for this Court to remand is whether there is some evidence from which a reasonable jury could find such an agreement. As noted, that evidence need not be direct or in the form of affirmative declarations. Indeed, statements made at or near the time of the events without the gauze of litigation are more trustworthy than what a party claims now that it is in the courthouse. And Robert Norris, before the lawsuit, repeatedly admitted that he and Piano Mill did not own the Piano. He was, in his own words, "the custodian" of the Piano. He would not repair it or sell it without Gibson's approval. He used it for promotional purposes.

Moreover, seeing the transaction as a bailment pursuant to a loan makes complete sense. A rational juror would understand that companies like Gibson Brands do not just give away assets worth $500,000.00, particularly when such a gift would favor a relatively new dealer over all the other dealers. A rational juror would understand that when the parties said Norris and Piano Mill were going to be "housing the Piano," that arrangement is certainly different from owning the Piano. A rational juror would see that a loan worked for both parties; publicity for Piano

Mill was also publicity for the Baldwin brand, the well known "win-win" solution. Giving the Piano to Piano Mill would accomplish no more than that. Any of those facts is enough to survive summary judgment. Together, the facts and inferences raise a myriad of factual issues and compel reversal.

While Norris and Piano Mill offer alternative and imaginative interpretations of Norris' statements and actions, that is all they are—alternatives. In evaluating the District Court's grant of summary judgment on Norris' and Piano Mill's motion, this Court must ignore the narrative Norris and Piano Mill give to the facts. *Dusel v. Factory Mut. Ins. Co.,* 52 F. 4th 495, 592 (1st Cir. 2022) ("We review a district court's grant or denial of summary judgment *de novo*, examining the record in the light most favorable to the nonmovant and drawing all reasonable inferences in that party's favor."). Doing so leaves a tremendous amount of evidence supporting the idea of a bailment based on loan. Accordingly, if this Court remarks on the issue of the existence of a bailment, it should instruct the District Court that whether such a bailment existed must be resolved by a jury at trial.[11]

---

[11] In its Motion for Summary Judgment, Gibson argued there is a lack of disputed facts as to whether there is a bailment contract and Norris breached that bailment contract as a matter of law. As this Court's review is *de novo*, this Court can find the undisputed facts show a bailment contract and breach of that bailment as a matter of law.

### III. The District Court Erred in Ruling on Summary Judgment that Gibson Foundation Failed to Present Evidence Specific Enough to Establish a Bailment Agreement with Norris and/or Piano Mill.

The summary judgment record also raises genuine issues of material fact as to Gibson Foundation's claim for breach of contract. As noted, there is a distinction between bailment and breach of contract even when the bailment rests on an agreement. As noted, bailment law defines the risk assumed by and the obligations of the bailee based on the type of bailment entered into. A contract *can* vary those obligations and/or risk level by setting specific terms for conditions of the bailment and the bailee's compensation. When they exist, contract terms are supplemental to the bailment, but not a necessary condition for the bailment to exist. The contract claim is both distinct and important because the remedies available to Gibson Foundation may differ if it should prove both theories at trial.

Gibson Foundation also notes that in the District Court, the briefing labeled this portion of the argument as the breach of a "Warehousing Agreement." A warehousing agreement is a type of contract through which one party holds and sometimes distributes the goods of another. Labelling a potential contract as a Warehouse Agreement, however, does not change the legal analysis. At bottom, a warehousing contract is still a contract and standard contract principles apply.

In that vein, the District Court granted Norris' and Piano Mills' summary judgment motion on the contract because, in her view, the Trial Judge believed that

the record did not contain enough detail to support the potential for an agreement. Gibson Foundation focuses its argument on that issue.

## A. Discussion

### i. Whether the Contract Gibson Foundation Alleges Exists is a Fact Issue Reserved For the Jury.

The contract Gibson Foundation alleges is relatively simple. Gibson Brands would allow Norris and Piano Mill the use of its valuable asset. That right would exist until Gibson Brands terminated it. In return Norris and Piano Mill would move the Piano and maintain the Piano while it was in their possession.

Generally, whether a contract exists is a fact issue reserved for the jury. *Albrecht v. Abouhamad*, 2000 WL 198931, *4 (Mass.Super. 2000) (11 Mass. L. Rptr. 169) (Mass. Super. 2005)) (Unpublished). A contract exists where the facts demonstrate the parties agreed on all the "essential" terms. *McCarthy v. Tobin*, 429 Mass. 84, 87 (Mass. 1999), The gravamen of the District Court's opinion is that there is insufficient proof of the needed agreement. ADD13-16. To measure that result, the Court should apply the basic test as collated and announced by a Massachusetts Superior Court:

> A meeting of the minds is essential to the creation of a contract. *Nortek, Inc. v. Liberty Mutual Insurance Company*, 65 Mass.App.Ct. 764, 772 (2006). The manifestation of mutual assent normally takes the form of an offer from one party that is accepted by the other. *See I & R Mech., Inc. v. Hazelton Mfg. Co.*, 61 Mass.App.Ct. 454, 455 (2004). "An offer is the manifestation of

> willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) Contracts, Section 24 (1981). "[***W***]*hen an offeree accepts the offeror's services without expressing any objection to the offer's essential terms, the offeree has manifested assent to those terms*." *Polaroid Corporation v. Rollins Env't. Serv*. (NJ), 416 Mass. 684, 691 (1993). … Where the parties have agreed to all material terms during preliminary negotiations, the fact that they also agreed to execute a subsequent formal instrument does not preclude the finding of a binding contract. *McCarthy v. Tobin*, 429 Mass. 84, 88 (1999)

*Dennis v. Kaskel* (Mass. Super. 2012) (Unpublished) (emphasis added).

In this situation, Gibson Foundation recognizes that there is no testimony or document that recites the described terms as an offer that was later accepted in writing or verbally. Instead, Gibson Foundation focuses on the emphasized portion of the contract rubric above. The highlighted sentence stands for the proposition that the existence of contracts can be and often are proven by the parties' conduct rather than by a signed document or oral assent. The summary judgment opinion glosses over that point.

The starting point would be the transfer of the Piano from Gibson Brands to Norris and Piano Mill. There is no dispute that the transfer, by itself, provided consideration to each side: Gibson Brands solved its storage problem and Norris/Piano Mill received use of a promotional asset.

Admittedly, the transfer, *by itself*, does not provide the most essential term of the contract: was this a loan, rental, gift, or sale? As already noted, however, that question was answered by the parties' later statements and conduct. For instance, the transfer was obviously not a rental because no payments were ever demanded or offered. So, then the question is whether the parties agreed the conveyance was temporary or permanent. The June 28, 2011 email between Dorn and Felber is enough for a rational juror to conclude that Gibson Brands meant the conveyance to be a loan for an indefinite period; it says exactly that. A352-354. The email to Norris regarding the transfer that refers to his "housing" of the instrument re-emphasizes the point. A355. Norris' silence to the housing comment and his own subsequent comments that: (1) he was the "custodian" of the instrument (A295-296); (2) he needed permission to do repairs on the instrument (A356); (3) he would allow Gibson Brands to retrieve the instrument (A358-359); and (4) he would like Gibson to sell the instrument could each be construed by a reasonable juror as Norris' assent to the temporary nature of his possession (A357-358); specifically, that he had the Piano on loan.

Massachusetts law recognizes just such a theory, calling it contracts implied-in-fact and contracts implied-in-law. *Sullivan v. O'Connor*, 81 Mass. App. Ct. at 212. An implied-in-fact contract may be inferred from the conduct and relationship of the parties. *See Global NAPS, Inc. v. Verizon New Englansd, Inc.*, Civil Action

No. 02-12489 and 05-10079-RWZ, 2015 WL 12781223, at *9 (D. Mass. March 10, 2015) (finding contract existed without a signed agreement because the parties' conduct demonstrated mutual assent to the agreement.); *see also T.F. v. B.L.*, 442 Mass. 522, 526-527 (2004) (finding a contract existed based upon the parties' conduct over time, and the fact that "defendant was, or should have been aware of the plaintiff's expectations"); *see also Vita v. Berman, Devalerio & Pease,. LLP*, 81 Mass.App.Ct. 748, 754-755 (2012) (finding a contract existed where a letter, plus the parties' conduct over time, demonstrated a benefit was conferred to one party that the other party reasonably expected to be compensated for).

On the other hand, a contract implied-in-law is "an obligation created by law for reasons of justice, without any expression of assent and sometimes even against a clear expression of dissent." *See Sullivan v. O'Connor*, 81 Mass. App. Ct. at 212 (a contract for property owners to pay for community services was created by purchasing the property and availing themselves such services); *see also Metropolitan Life Insurance Company v. Beard*, No. 16-11782-PBS, 2019WL480513, *6-8 (D. Mass. Feb. 7, 2019) (finding the defendant was required to pay back an over payment of insurance proceeds, or else it would have created a windfall). Under either formulation, a reasonable juror could conclude from the manufacturer-dealer relationship and from Norris' statements that the transfer of the

Piano was a loan (an implied-in-fact contract) or, alternatively, should be treated as such (an implied-in-law contract).

The summary judgment opinion actually accepts Gibson Foundation's argument when it comes to analyzing Norris' and Piano Mill's declaratory judgment claim. In the Trial Judge's analysis, the same facts that were insufficient to create a genuine issue of material fact as to whether Gibson owned the Piano and loaned it out *are* sufficient to create a genuine issue of material fact as to whether Norris and Piano Mill took ownership of the Piano on transfer or merely borrowed it. But these two things are different sides of the same coin. There is no logical reason why—on the same record—there can be a fact issue as to whether someone borrowed an item, but there is no fact issue as to whether someone lent the item.[12] For all these reasons, the Court should find that the existence of contract between the parties is, at least, a question of fact for the jury.

---

[12] In analyzing whether there was sufficient evidence of the essential terms of the contract that Gibson Foundation alleges the only term that summary judgment opinion addresses is the loan or sale/gift question. Given the simplicity of the transaction, the Trial Judge's narrow approach was appropriate. That is *the* essential term of the contract-loan or ownership? Nothing else is in issue. Gibson Foundation notes this narrowness because the summary judgment opinion does also mention the need to present evidence of the essential terms of an alleged contract, using the plural of "term." As the summary judgment opinion restricts its finding to one term despite that language, if this Court should believe additional terms need to be explored, the manner in which that should be done is a remand to the District Court for further proceedings.

### ii. The District Court Improperly Disregarded Evidence of Emails Between Gibson Brands Employees.

The summary judgment opinion disregards the Dorn-Felber email of June 28, 2011, in which the two gentlemen explain their view of the proposed transaction as a long-term loan. A352-354. The relevance of the email is two-fold. The email illustrates Gibson Brands' understanding of the transaction and the benefit that the loan would have for Norris and Piano Mill. The email also provides context for Norris' later comments that are consistent with the email. In other words, Gibson Foundation understands the summary judgment opinion when it says the email would be irrelevant to Norris' and Piano Mill's state of mind absent Norris or another agent of Piano Mill adopting the position espoused in the email. ADD15. The point here is that Norris repeatedly *did adopt* the position represented in the email. *E.g.* A362, A352-354, A355, A356, A295-296, A357-359, A357. Yet, the Trial Judge viewed the email as hearsay that could not be turned into admissible evidence absent testimony from Dorn or Felber.[13] ADD15.

_____

[13] Of note, the admissibility of the emails was later addressed and briefed fully by the parties when, in preparation of trial, Norris and Piano Mill filed its motion in limine to exclude Gibson Foundation's internal emails as hearsay. *See* Norris Motion in Limine at Dkt. 137. Gibson Foundation opposed the motion in limine, demonstrating that several nonhearsay purposes for the internal emails exist and that even where the emails do fall under the definition of hearsay, they fall under exceptions to the rule. Gibson Foundation Opposition to Norris Motion in Limine at Dkt. 158. Ultimately, the Court agreed with Gibson Foundation that a determination, at that phase, that the internal emails were hearsay was premature, and the Court denied Norris' motion in limine. *See* Dkt. Entry 167 at A21-22.

The District Court was incorrect in its judgment about admissibility and therefore should not have excluded the email from its considerations. First, to qualify as hearsay, evidence must be offered to prove the truth of the matter asserted by the declarant's statements. Fed. R. Evid. 801(c)(2). As noted, the import of this exhibit is not the literal truth of the declarant's statements; instead, the email explains what Gibson Brands intended for the transaction. Out-of-court statements offered to prove intent are not hearsay. *Staniewicz v. Beecham, Inc*., 687 F.2d 526, 530 (1st Cir. 1982); *see also* Gibson Foundation Opposition to Norris Motion in Limine at Dkt. 158 at 2-3.

Second, this particular email would be rendered admissible under Fed. R. Evid. 803(6) as a "business record." The use of "business record emails" as evidence has been the subject of repeated scrutiny. The result of this scrutiny is that there is no bright line rule about admitting emails as business records. The most common formulation is also the simplest: an email is like any other out-of-court statement made in the course of business. Emails are neither *de facto* admissible nor inadmissible; instead, the proponent offering an email as admissible under the Fed. R. Civ. P. 803(6) exception to the hearsay rule must demonstrate the email meets the requirements of the exception. *United States v. Daneshvar*, 925 F.3d 766, 777 (6th Cir. 2019) ("Of course, an email can qualify as an admissible record of a regularly conducted business activity as long as the proponent satisfies the requirements of

Rule 803(6).”). Courts in this circuit have adopted this formulation. *Indiaweekly.com, LLC v. Nehaflix.com, Inc.*, Case No. 07-cv-0194 (TLM), pp. (D. Conn., June 6, 2011) (Admitting email as a business record) and *Burnett v. OceanProps, Ltd.*, 2:16-cv—00359, pp. 5-6 (D. ME., Oct. 26, 2018) (stating that emails may be admissible under Fed. R. Evid. 803(6) if the writing otherwise meets the exception requirements). Finally, the affidavit of Cesar Guiekian provided the necessary evidence proving the business records; evidence that was not contradicted by the defendants. A348-349; *see also* Gibson Foundation Opposition to Norris Motion in Limine at Dkt. 158 at 5-6.

Thus, the email the Trial Judge disregarded in her analysis should be admissible at trial. Summary judgment evidence need not be submitted in admissible form. Indeed, the new formulation of Fed. R. Civ. P. 56 mandates a procedure that did not occur in the District Court. In 2010, the Rules Committee adopted what is now Fed. R. Civ. P. 56(c)(2), which provides that “A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.” The Advisory Committee note on the section makes clear that such an exception shifts the burden to the proponent of the evidence to either demonstrate that the evidence is in admissible form or to explain how the evidence could be presented in admissible form at trial. Norris and Piano Mill, however, did not object to or comment on the inclusion of the email in the summary

judgment record. Instead, the Trial Judge's comments were *sua sponte*. By not following Rule 56(c)(2)'s clear procedure, the issue of the emails' admissibility did not arise until after the briefing was complete. Obviously, Gibson Foundation could not make its case for admissibility at that point and thus, suffered undue prejudice by way of the Trial Judge's exclusion of evidence for which there was no objection. *Cf., Capobianco v. City of New York*, 422 F.3d 47, 55 (2nd Cir. 2005) (criticizing district court's *sua sponte* exclusion of summary judgment evidence). At least one circuit recently impliedly rejected the District Court's *sua sponte* approach noting that under the new rule "*Upon objection*, '[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.'" *People Source Staffing Professionals. v. Robertson,* Case No. 21-30368, P.2 (5th Cir., Aug. 25, 2022, per curiam) (Emphasis added and citing Rule 56(c)(2)) (Unpublished). Importantly, the Fifth Circuit's sensible formulation is that the burden of demonstrating likely admissibility does not arise until the responding party objects, which did not happen here. *See Cohen v. Gilmore (In re Ala. &amp; Dunlavy, Ltd.)*, 983 F.3d 766, 774 (5th Cir. 2020) ("Courts also typically consider evidence *unless the objecting party can show* that it could not be reduced to an admissible form at trial. See FED. R. CIV. P. 56(c)(2), citing *Maurer v. Indep. Town* , 870 F.3d 380, 384 (5th Cir. 2017)) (Emphasis added).

Moreover, to consider the emails, the District Court must only believe that the evidence *could be* submitted in an admissible form. *See, e.g., Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278 (11th Cir. 2022) ("Nevertheless, evidence that can be reduced to an admissible form at trial should be considered at summary judgment.") (citing *Smith v. Marcus & Millichap, Inc.*, 991 F.3d 1145, 1156 n.2 (11th Cir. 2021) ("[E]vidence does not have to be authenticated or otherwise presented in an admissible form to be considered at the summary judgment stage, as long as the evidence could ultimately be presented in an admissible form.")); *Jacoby v. Keers,* Case No. 17-13400, P. 6 (11th Cir. July 22, 2019) (per curiam) (accepting summary judgment evidence into record after an objection based on counsel's assertion in reply brief that the party could prove the records admissible under Fed. R. Evid. 803(6)). The exhibit at issue was an email between two people acting on behalf of Gibson Brands. As the exhibit is offered not for the truth of the matter of the statements in it and because on its face there exists the possibility that the email is admissible under the business records exception, the District Court erred in not considering the email as summary judgment evidence.

### iii. Gibson Foundation Provided Sufficient Evidence to Demonstrate Its Ownership of the Piano.

Finally, Norris and Piano Mill made the odd argument that Gibson Foundation's claims must fail because it cannot prove that Gibson Brands ever owned the Piano. The argument is odd because Norris and Piano Mill's claims derive

from Gibson Brands' ownership; more simply, if Gibson Brands did not own the Piano then Norris and Piano Mill cannot own the Piano. The District Court obliquely referred to the dispute in the Summary Judgment opinion, but the lack of ownership defense does not inform the Trial Judge's decision in any meaningful way. As a precaution, however, Gibson Foundation notes that it is undisputed that Gibson Brands possessed the Piano before loaning it to Norris and Piano Mill. The law has long been clear that "Possession is prima facie evidence of title, good against everybody but one proving property; that is, against anyone but the right owner." *Magee v. Scott*, 63 Mass. 148, 150 (1851). As Norris and Piano Mill do not claim to be a predecessor owner of the Piano and did not present any evidence negating Gibson Brands' ownership, the prima facie evidence of possession is sufficient to withstand any summary judgment argument that Gibson Brands did not own the Piano.

## CONCLUSION

Summary judgment is an inappropriate vehicle to resolve which of two competing versions of an event is true if each version enjoys some supporting evidence. The underlying dispute is just that. Where Gibson sees a loaner piano, Norris and Piano Mill see a completed conveyance without a written document signed by Gibson. To ignore the idea of a loaner piano and a resulting bailment, however, one must ignore a series of admissions made by Rob Norris that he and his

company did not own the Piano and the fact that Norris could not enforce his ownership claims per the Statute of Frauds. Similarly, to find Gibson Foundation's claims time-barred, one must ignore the logic, language, and ultimate holding in the on-point precedent: *Aimtek, Galvam, and Ball*.

Unfortunately, the District Court made both mistakes. In doing so, the District Court created harmful error that must be reversed by this Court: (1) vacating the Final Judgment, (2) reversing the Summary Judgment Order, (3) instructing the District Court that the Massachusetts' six-year limitations period applies, and (4) remanding the matter for a trial on the merits of Gibson Foundation's claims for breach of bailment and breach of contract. Gibson Foundation respectfully requests the Court to take these steps.

Respectfully submitted March 27, 2023,

/s/ Andrea E. Bates
ANDREA BATES
First Circuit Bar No. 1205498
KURT SCHUETTINGER
First Circuit Bar No. 1205644
BATES & BATES LLC
1890 Marietta Boulevard, NW
Atlanta, Georgia 30318
(404) 228-7439
abates@bates-bates.com
kschuettinger@bates-bates.com

STEVEN D. HOWEN
LAW OFFICES OF STEVEN HOWEN
7111 Bosque Boulevard
Suite 305

Waco, Texas 76710
(254) 826-6526
Attorneys for Appellant
GIBSON FOUNDATION, INC.

## <u>CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(G)(1)</u>

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this document complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 11,886 words.

I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in a 14-point Times New Roman font.

*/s/* Andrea E. Bates
Andrea E. Bates, Esq

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2023, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

Daniel J. Gibson, Esq.
SKB Attorneys
1140 Washington Street
Hanover, MA 02339
Tel.: (781) 829-9993
djg@skb-law.com

*/s/* Andrea E. Bates
Andrea E. Bates, Esq.

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

                                                                                **Page**

Memorandum and Order, filed May 25, 2022 ....................................... ADD1

Final Judgment, filed October 24, 2022 ................................................ ADD19

i

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GIBSON FOUNDATION, INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:20-cv-10682-IT |
| | * | |
| ROB NORRIS, d/b/a The Piano Mill, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

May 25, 2022

TALWANI, D.J.

In its Amended Complaint [Doc. No. 61], Plaintiff Gibson Foundation, Inc.

("Foundation") brings claims against Defendant Rob Norris, doing business as the Piano Mill,

for (1) breach of contract, (2) breach of bailment, and (3) conversion. In his counterclaim, Norris

brings claims for (1) declaratory judgment, (2) equitable relief and (3) abuse of process. All these

claims arise from a dispute over the ownership of a piano. Foundation asserts that the piano was

loaned to Norris, while Norris counters that he was told he could have the piano outright if he

successfully moved it from New York. Now before the court are the parties' cross-motions for

summary judgment. Mots. for Summ. J. [Doc. Nos. 99, 101]. For the following reasons, Norris's

motion is GRANTED, and Foundation's motion is GRANTED IN PART and DENIED IN

PART.

**I.      Factual Background**

Having reviewed the parties' statements of undisputed facts, exhibits, and objections, the

court summarizes the facts as follows, noting the areas of dispute.

ADD1

A.    *The Subject Piano*

Baldwin Piano & Organ Company ("Baldwin") is an American piano brand. Gueikian

Aff. ¶ 5 [Doc. No. 101-13]. In the 1980s, Baldwin custom made two model SD-10 concert grand

pianos for Liberace, an American pianist, singer, and actor. Piano Appraisal 2 [Doc. No. 99-4].

One of the two pianos—the subject of this dispute—has the serial number 255848. Id.

B.    *Foundation's Claim of Ownership of the Subject Piano*

In 2001, Baldwin filed for bankruptcy. Asset Purchase Agreement 2 [Doc. No. 101-15].

As part of the bankruptcy proceedings, General Electric Capital Corp. ("GE") and Baldwin

effected an asset purchase agreement in which GE agreed to purchase "substantially all" of

Baldwin's assets. Id. The asset purchase agreement contemplated the sale of Baldwin's "personal

property" but also specified that certain categories of personal property, including personal

property located in Greenwood, Mississippi, would be excluded from the sale. Id. at 2-3. The

agreement did not identify whether any pianos were included among the personal property being

sold to GE. See id. In November 2001, GE assigned its rights, title, and interest in the asset

purchase agreement to Gibson Piano Ventures, Inc. ("Gibson Piano Ventures"), Assignment 2

[Doc. No. 101-16], and designated Gibson Piano Ventures as the buyer of Baldwin and its assets,

Bill of Sale [Doc. No. 101-17].

Cesar Gueikian is the President of Gibson Brands, Inc. ("Gibson"). Gueikian Aff. ¶ 3

[Doc. No. 101-13]. Gueikian believes that Gibson acquired the piano through the 2001 purchase

of "Baldwin and all of the assets," but he is unaware of the existence or location of any inventory

documents that show the subject piano coming into Gibson's possession. Gueikian Depo. 45

[Doc. No. 101-12]. The record contains no evidence explaining the relationship between Gibson

and Gibson Piano Ventures. Baldwin has been a subsidiary of Gibson since 2001. Gueikian Aff.

¶ 5 [Doc. No. 101-13].

2

ADD2

Foundation is also a subsidiary of Gibson. Id. at ¶ 4. On November 19, 2019, Gibson

reportedly donated the subject piano to Foundation. Nov. 19, 2019 Letter [Doc. No. 101-11].

    C.    *Norris's Possession of the Subject Piano*

On June 20, 2011, Baldwin's business development manager, Tom Dorn, emailed several

people including Norris about the immediate availability of two, new model BD275/BH275

concert grand pianos from Baldwin Dongbei. Gueikian Aff. ¶ 17 [Doc. No. 101-13]; Emails 12

[Doc. No. 101-14]. Norris responded that the "Piano Mill would still very much like to have a

Baldwin concert grand to use for symphony rentals and promotional opportunities" but that he

was "not currently in a position to shell out the 30k to purchase one outright." Emails 13 [Doc.

No. 101-14]. He then mentioned that his business partner was connected to several international

touring acts, such as Bob Segar, and wondered whether Dorn might be able to come up with a

"creative arrangement" to help both the Piano Mill and Baldwin gain exposure. Id. Dorn

responded that such an arrangement was "beyond [his] scope" but that he would forward

Norris's email to someone in Gibson's entertainment relations department. Id. Norris thanked

Dorn and added as "just another thought" that the Piano Mill had a full service restoration shop,

and that "[i]f there was a road worn concert grand in Baldwin[']s stable," Norris would be able to

do any restoration required "to get it to concert level play and back on the road." Id.

According to Norris, at some point after his email exchange with Dorn, Dorn called and

said that Gibson had a Baldwin model SD-10 that Norris might be interested in and gave him the

number for Jim Felber, an employee in Gibson's entertainment relations department. Emails 3,

13 [Doc. No. 101-14]; Norris Depo. 25 [Doc. No. 99-3]. Norris and Felber then had several

phone calls, during which Felber told him that the subject piano was on the seventh floor of the

Manhattan Center in the Hammerstein ballroom, which was being renovated. Norris Depo. 27

[Doc. No. 99-3]; Pl's Req. for Admissions Resp. No. 20 [Doc. No. 99-2]. Norris claims that

3

ADD3

Felber told him that the piano would be "all yours" if Norris could remove it by the end of the week. Norris Depo. 26 [Doc. No. 99-3].[1]

On July 11, 2011, Norris's contractors moved the subject piano from the Hammerstein ballroom to his restoration shop in Hampton, Massachusetts. Id. at 27-28; Emails 14 [Doc. No. 99-5]. The summary judgment record contains no evidence of any written agreement between Gibson (or any related party) and Norris regarding either a sale of the subject piano or a bailment.

     D.    *Communications and Events Between 2011 and 2014*

Three days after moving the subject piano, Norris emailed Dorn and Felber to let them know that the piano had been safely moved and thanking them for "this opportunity." Emails 15 [Doc. No. 99-5]. Norris told them that the Piano Mill wanted to use the subject piano "in conjunction with promotional Baldwin sales, as well as occasionally renting it out to name acts," and that he would keep Dorn and Felber "apprised of any such happenings." Id. Norris also informed them that the piano had "seen some road wear" and asked whether it would be "okay to make some cosmetic repairs as well as to do some fine regulation to the action." Id. Felber responded that he was "OK with repairs and aware of missing pieces." Id. at 25.

---

[1] Foundation disputes that Felber told Norris he could have the piano, pointing to an email exchange between Felber and Dorn in which Felber suggested that they offer the piano to Norris on a long-term loan. Neither Dorn nor Felber, however, would be available as a witness at trial. See Pl's Updated Supp. Initial Disclosures ¶ 3 [Doc. No. 99-10] (stating as to Dorn and Felber that Foundation and its counsel "are unaware of the whereabouts of this individual at this time"). The emails are not admissible to prove Norris's knowledge of Dorn and Felber's proposal where there is no evidence that these communications were passed on to Norris or even that Norris was aware of them. In any event, the emails do not rebut Norris's testimony regarding what Felber said to Norris.

ADD4

In 2013, the subject piano was the topic of a local news story entitled "Liberace's rhinestone piano resides in Rockland, [Massachusetts]." Letter & Exhibits 7-9 [Doc. No. 101-6]. The article stated that the subject piano had been temporarily installed in the lobby of the Time Warner Center to promote "Behind the Candelabra," a Steven Soderbergh biopic about Liberace. Id. at 8. Norris states that he, not Gibson, orchestrated the loan of the subject piano to the Time Warner Center. Norris Depo. 34 [Doc. No. 104-15].[2]

The article also quotes Norris as saying that he is the subject piano's "indefinite custodian." Letter & Exhibits 8 [Doc. No. 101-6]. Foundation asserts that this is an admission that Norris did not own the piano. Id. at 2. Norris claims that this was a reference to his mortality and that he always states that the "true owners" of a piano are "its fans." Norris Depo. 54 [Doc. No. 101-2]; Norris Decl. [Doc No. 104-14].

Throughout this period, the subject piano remained in Norris's possession, and no request was made by Gibson or anyone else for its return. Pl's Interrogatory Resp. Nos. 24-25 [Doc. No. 99-2].

E.    *Piano Mill Showroom Roof Collapse and Gibson's Request for Return of the Subject Piano*

On February 10, 2015, the roof of the Piano Mill's Rockland store collapsed, and the disaster drew significant media attention. Emails 7 [Doc. No. 101-14]. In the aftermath, Norris

---

[2] Foundation claims that Gibson loaned the subject piano to Mr. Showmanship Productions, LLC, between July 25, 2012, and September 7, 2012, pursuant to a "loaner agreement" for use in Soderbergh's film. Pl's Statement of Undisputed Material Facts ("Pl's SOF") ¶ 8 [Doc. No. 102]. However, the loaner agreement is for a piano with the serial number 213449 2259, which is not the subject piano's serial number. Loaner Agreement [Doc. No. 101-19]. The article explained that the movie's "[p]roducers had wanted to use the [subject piano] during filming in Las Vegas, but the cost to ship it . . . was considered too high. Instead, Soderbergh used Liberace's *other* concert grand piano adorned with rhinestones, the one that was on display at the Liberace Museum in Las Vegas." Id. (emphasis original).

5

ADD5

told the Associated Press that the subject piano was valued at $500,000, and this estimate was subsequently repeated across media outlets. Id.

The next day, Dorn emailed Norris to say that he was sorry to hear about the collapse and asking Norris to give him a call. Id. at 9. Dorn explained that he was getting a lot of questions about the subject piano "because . . . [he] just learned Monday evening that Gibson wanted to move the piano back to [New York] because they have upcoming promotions on Broadway." Id. Norris replied that the subject piano was "unscathed," and Dorn thanked Norris for "all [he] ha[d] done to take care of [it]" and informed Norris that "Gibson [would] want to move it quickly" and that Dorn would get back to him with details as soon as possible. Id. at 8.

On February 12, 2015, Norris emailed Dorn, telling him that the building had been declared a total loss and needed to be completely leveled and that there was approximately $800,000 to $1,000,000 in inventory still inside. Id. He then "propose[d] an idea—Would the folks at Gibson be willing to have the [subject piano] auctioned off with the proceeds donated to Piano Mill[']s reconstruction and restoration of all the other pianos[?]" Id. at 8. Norris noted that there would "probably never be a better time for this considering all the national press" and that "it sure would be great press for Gibson." Id. Dorn said that he would mention Norris's idea to Gibson's entertainment relations division but that he strongly suspected they would not be willing to auction off the piano, since "it is an asset that is valued at approximately $500K that is irreplaceable." Id. Dorn also asked whether, when Norris originally picked up the piano, Felber had had him sign a loan agreement because the Gibson office in Nashville was asking about it, and Felber had left Gibson the year prior. Id. Norris responded that "nothing was ever signed. [Felber] literally just said if you can come to the Ham[m]erstein and get it out it's all yours. No paperwork." Id. Norris added that he was the one who had provided the $500,000 estimated

6

value and that he had documentation valuing the subject piano at $200,000 when it was first made. Id.

On March 13, 2015, Norris emailed Dorn that the subject piano could not be "loaned out at this time" and that "[d]ue to the recent catastrophic events that took place at Piano Mill, there [was] a big fundraising concert event being planned with [the subject piano] being center stage." Id. at 11. Dorn responded that it was "not so much a matter of the [subject piano] being loaned out, as Gibson planning their own events using their own piano." Id. at 10. He stated that Gibson had planned a piano mover to come to the store the next week to pick up the piano. Id. Norris responded on March 17, 2015, that after reading Dorn's email "it seem[ed] apparent that [they] disagree[d] on the ownership of the [subject] piano." Id. Norris explained that when Felber had contacted him five years prior, "he specifically said that the piano was all [Norris's] if [he] could get it out of the [Hammerstein] ballroom." Id. Norris stated that he "wouldn't have invested the time and expense in moving and restoring the piano, not to mention insuring it, if [he] were not taking ownership." Id. Dorn answered that he had email correspondence from Felber in June of 2011 that "specifically referr[ed] to placing the piano with [Norris] on a 'long-term loan' in consideration for [Norris's] cartage and storage of the piano" and that "[t]he value of having this piano—on loan—on display in [Norris's] store was the agreed compensation for [his] expense." Id.[3]

On June 8, 2015, Gibson's general counsel emailed the Piano Mill, stating that it was "very clear" that Norris's possession of the piano came about as a "Loaner/Storage arrangement"

---

[3] The only emails in the record that can be squared with this assertion are the emails between Dorn and Ferber (and not Norris) as discussed above. Dorn ceased working for Baldwin sometime in 2015. Gueikian Aff. ¶ 17 [Doc. No. 101-13].

ADD7

and that "historical contemporaneous email communications from [Norris] acknowledged the same." Jun. 8, 2015 Email [Doc. No. 99-6]. The Piano Mill's counsel responded by letter dated June 26, 2015, stating that the Piano Mill had (1) "rescued the [subject piano] from destruction based on promises that it would own the rescued piano"; (2) "cared for and insured the piano (again, at its own expense) for many years"; and (3) loaned the piano to others, including Gibson, only when the borrower acknowledged that the piano was on display courtesy of the Piano Mill and promised to return the piano. Jun. 26, 2015 Letter [Doc. No. 99-7]. The letter also noted that, in all the years that the Piano Mill had openly loaned out the subject piano, Gibson had never made a claim of ownership until the news report of the Piano Mill's roof collapse "trumpeted the potential dollar value of the piano." Id. Finally, the letter stated that Gibson had not produced any evidence of its superior right to the piano, in contrast to the Piano Mill "clear" indicia of ownership. Id. Given the Piano Mill's "long-term relationship with Baldwin," however, the Piano Mill would consider an "amicable resolution" of the dispute. Id. There is no evidence in the record of any further communications between Gibson and the Piano Mill for the next four years.

     F.    *Demand Letters and Gibson's Donation of the Subject Piano to Foundation*

On March 22, 2019, Gibson's counsel sent a demand letter to Norris with the subject "Baldwin BD275 HPE 9 (Liberace Piano)." Mar. 22, 2019 Letter [Doc. No. 101-5]. The letter demanded that Norris immediately return the piano in his possession—which counsel incorrectly identified as a Baldwin BD275 HPE 9 piano—insisting that Gibson was the rightful owner, that emails from 2015 demonstrated that Norris wanted but could not purchase a model BD275, and that Norris and Gibson had entered into a contractual bailment agreement. Id. Gibson and Norris's counsel exchanged several additional letters between April and August 2019. See Apr.

8

29, 2019 Letter [Doc. No. 101-6]; May 19, 2019 Letter [Doc. No. 101-7]; Aug. 8, 2019 Letter [Doc. No. 101-8]; Aug. 24, 2019 Letter [Doc. No. 101-9].

On October 9, 2019, Gibson's counsel sent Norris's counsel a letter, which stated that Gibson "had decided to donate the Baldwin BD275 HPE 9 that had been in [Norris's] care to Foundation . . . for a special charity auction to raise money for the Foundation's programs." Oct. 9, 2019 Letter [Doc. No. 101-10]. The letter conveyed Foundation's offer to Norris of five percent of the proceeds of the sale of the piano in exchange for his cooperation in promptly returning the piano. Id.

On November 11, 2019, Gibson and Foundation executed a bill of sale, which purported to transfer ownership of a "Baldwin Liberace SD-10" to Foundation. Bill of Sale [Doc. No. 101-18]. The bill of sale does not include a serial number specifying the piano being transferred.

On November 19, 2019, Gibson's counsel, now representing Foundation but "[c]ontinuing on Gibson's . . . correspondence," sent Norris a letter informing him that Foundation "was pleased to report that Gibson [had] donated the Baldwin BD275 HPE 9" to Foundation and that "as promised by Gibson," Foundation would give Norris five percent of the proceeds from the sale of the piano if he promptly returned it to Foundation. Nov. 19, 2019 Letter [Doc. No. 101-11].

## II.    Procedural Background

Foundation initiated this lawsuit against Norris on December 16, 2019, in the Middle District of Tennessee. Compl. [Doc. No. 1]. Norris specially appeared and moved to dismiss for lack of personal jurisdiction and improper venue. Mot. [Doc. No. 9]. The District Judge concluded that it lacked personal jurisdiction and that venue was improper, Mem. & Order [Doc. No. 28], and transferred the case to this district, Order [Doc. No. 29].

9

ADD9

Foundation filed an Amended Complaint [Doc. No. 61] on September 23, 2020, and

Norris thereafter filed his Answer and Counterclaim [Doc. No. 64]. The parties filed the pending

Cross-Motions for Summary Judgment [Doc. No. 99, 101] on January 28, 2022. Norris's motion

seeks summary judgment on Foundation's claims, while Foundation's motion seeks summary

judgment as to both its claims and Norris's counterclaims.

### III.    Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate

when "the movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under

the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers, Inc., 670 F.3d 119, 125 (1st

Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving

party. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute

of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden can be satisfied

in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-

moving party's claim or (2) by demonstrating that the non-moving party failed to establish an

essential element of its claim. Id. at 331.

Once the moving party establishes the absence of a genuine dispute of material fact, the

burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of

material fact remains. Id. at 314. The non-moving party cannot oppose a properly supported

summary judgment motion by "rest[ing] on mere allegations or denials of [the] pleadings."

Anderson, 477 U.S. at 256. Rather, the non-moving party must "go beyond the pleadings and by

ADD10

[his or] her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. Anderson, 477 U.S. at 248.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." Anderson, 477 U.S. at 255.

The fact that the parties have filed cross motions does not alter these general standards; rather the court reviews each party's motion independently, viewing the facts and drawing inferences as required by the applicable standard, and determines, for each side, the appropriate ruling. See Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996) (noting that cross-motions for summary judgment do not "alter the basic Rule 56 standard" but rather require the court "to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed").

**IV.   Discussion**

    A.   *Foundation's Claims*

Each side seeks summary judgment as to Foundations' claims for conversion, breach of bailment, and breach of contract.

ADD11

1.      Conversion and Breach of Bailment

Foundation's claim of conversion against Norris is based on his failure to return the subject piano. Norris counters that the claim is barred by Massachusetts' three-year statute of limitations for tort actions, Mass. Gen. Laws ch. 260, § 2A, where Foundation (1) did not bring this action within three years of Gibson's demand for the return of the piano and (2) cannot establish an ownership interest at the time of the alleged conversion.

Under Massachusetts law, a plaintiff asserting a conversion claim must show that

(1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused.

Evergreen Marine Corp. v. Six Consignments of Frozen Scallops, 4 F.3d 90, 95 (1st Cir. 1993).

On June 8, 2015, Gibson's general counsel emailed Norris demanding return of the subject piano and informing him that failure to do so would result in immediate legal action. Jun. 8, 2015 Email [Doc. No. 99-6]. On June 26, 2015, Norris's counsel responded that he did not agree that Gibson had a right to the piano. Jun. 26, 2015 Letter [Doc. No. 99-7]. Foundation's counsel understood this to be a refusal to return the piano. Pl's Req. for Admissions Resp. No. 26 [Doc. No. 99-2].

In his Motion for Summary Judgment [Doc. No. 99], Norris made a typographical error and wrote that his refusal to return the subject piano was "clarified beyond doubt on June 26, 2017," when his counsel sent Gibson the aforementioned letter. Seizing on that mistake, Foundation argues that it commenced its action within three years of June 26, 2017, and that its claim is therefore within the statute of limitations. A typo in Norris's motion does not change the accrual date of Foundation's claim, however, and that argument is rejected as frivolous.

12

ADD12

Foundation argues further that although *Gibson* may have had notice of a cause of action in June 2015, *Foundation*, a separate entity, did not have a cause of action until after Norris refused to return the subject piano in response to its November 19, 2019 letter. But to the extent that Foundation has any possessory claim to the piano, that right is derivative of Gibson's rights. And to the extent that Gibson has failed to bring a timely claim, the statute does not start to run anew because of the transfer. Alternatively, if Foundation's possessory right is independent of Gibson's rights, Foundation has no claim at all, for "at the time of the alleged conversion" in 2015, Foundation had neither ownership nor possessory interest.

Foundation's claim for breach of bailment is similarly time-barred. Under Massachusetts law, "claims arising from the breach of a bailment have been brought as conversion or replevin actions." Aimtek, Inc. v. Norton Co., 69 Mass. App. Ct. 660, 663, 870 N.E.2d 1114 (2007) (collecting cases); see also Atlantic Fin. Corp. v. Galvam, 311 Mass. 49, 50, 39 N.E.2d 951 (1942) ("A bailor entitled to possession may maintain an action for conversion"); Warren v. Ball, 341 Mass. 350, 352-53, 170 N.E.2d 341 (1960) (action for replevin brought to recover bailed goods still held by bailee). The statute of limitations for both conversion and replevin actions is three years. Mass. Gen. Laws ch. 260, § 2A.

Accordingly, the court grants Norris summary judgment on Foundation's conversion and breach of bailment claims.[4]

> 2. Breach of Contract

Foundation also brings a claim for breach of contract. Foundation asserts that in return for loaning the piano to Norris for the purpose of warehousing and promoting it, Norris agreed to

---

[4] To the extent that Foundation brings the breach of bailment claim as a "warehousing" contract claim, the court addresses breach of contract in the next section.

pick the piano up from its New York location, perform any needed repairs, and house the piano. Norris argues that Foundation cannot establish the existence of a "warehousing agreement" and that if such an agreement existed, the essential terms are not sufficiently definite.

"Under Massachusetts law, in order to create an enforceable contract, there must be 'agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement.'" In re LP & D, Inc., 622 B.R. 473, 483 (D. Mass. 2020) (quoting Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 878, 724 N.E.2d 699 (2000)). "To prove a breach of contract under Massachusetts law, a plaintiff must show that there was a valid contract, that the defendant breached its duties under the contractual agreement, and that the breach caused the plaintiff damage." Shaulis v. Nordstrom Inc., 120 F. Supp. 3d 40, 54 (D. Mass. 2015) (citation omitted).

The thrust of Foundation's argument in support of its breach of contract claim is that (1) in June 2011, Norris admitted that he could not purchase a Baldwin piano, (2) Gibson therefore offered Norris a long-term loan of the subject piano, and (3) Norris breached the terms of the contract by refusing to return the piano upon Gibson's, and then Foundation's, request. But Foundation has not offered sufficient evidence from which a jury could find an agreement on the material terms of such a contract.

First, Foundation either misunderstands or misrepresents the June 2011 emails with Norris. The original June 20, 2011 email from Baldwin referred to model BD275/BH275 concert grand pianos. In response, Norris responded that he could not afford such a piano but wondered whether Gibson might be able to come up with a "creative arrangement" that would allow him to use one for symphony rentals and promotional opportunities. Norris then added, as "just another thought," that he had a full-service restoration shop and could restore a "road worn" piano.

14

Gibson's initial references to a BD275 piano and Norris's subsequent email about a road-worn piano refer to two different things, and Foundation's conflation of a Baldwin Dongbei BD275 and the subject piano, which is a model SD-10 from the 1980s, misses the point of Norris's later suggestion.

Second, insofar as Foundation relies on the June 2011 emails between Dorn and Felber as proof of a loan between Gibson and Norris, that reliance is misplaced. Those emails are hearsay and are not reducible to competent evidence where Gibson and Foundation have been unable to produce Dorn or Felber as witnesses. And, even if the emails were admissible as to the conversation between Dorn and Felber, the emails—which were not sent to Norris—do not rebut Norris's claims that Felber told Norris that he could have the piano outright if he moved it from New York City.

Third, Foundation claims that Norris delivered the subject piano to different locations based on Gibson's lease agreements with third parties. But the only evidence Foundation has adduced in support is a loaner agreement for a piano with a different serial number.

Finally, Foundation points to several statements or silences by Norris as proving that Norris knew that he did not legally own the piano: a 2013 news article in which Norris referred to himself as the subject piano's "indefinite custodian"; the lack of any claim of ownership by Norris until after the Piano Mill's roof collapsed; and Norris's request that Gibson auction off the subject piano and donate the proceeds to the Piano Mill's reconstruction. While this evidence as to ownership may have had bearing on a conversion claim had such a claim not been time-barred, and will be relevant to Norris's declaratory judgment claim as discussed below, the evidence is not sufficient to establish an agreement between the parties on the material terms of a contract to warehouse the piano.

ADD15

Accordingly, where Foundation has not produced sufficient evidence from which a jury could find an agreement on the material terms of a contract, the court grants Norris summary judgment as to Foundation's breach of contract claim.

B.    *Norris's Counterclaims*

1.    Declaratory Judgment[5]

Norris counterclaims for declaratory judgment declaring him the owner of the subject piano. Foundation argues that it is entitled to summary judgment where the undisputed evidence demonstrates that Foundation owns the subject piano.

The evidence as to the ownership of the piano, however, is not undisputed. While Foundation points to Norris's statements and silences between 2013 and 2015 as described above, Norris's testimony that Felber told him in 2011 that he could have the piano outright if he moved it from New York City is unrebutted. Norris also notes that Gibson did not make any claim to the piano for four years until after he provided an estimate of its value to the media in the aftermath of the roof collapse.

In sum, there remains a factual dispute as to Norris's claim of ownership of the piano, which is for a jury, not the court, to decide. Foundation's motion for summary judgment as to this claim is therefore denied.

2.    Abuse of Process

Foundation also seeks summary judgment on Norris's counterclaim for abuse of process. "To succeed on a claim for abuse of process, a moving party must prove that (1) a process was

---

[5] The counterclaim also contains a claim for "equitable relief," but that claim appears to seek identical relief—an order declaring Norris the owner of the subject piano. The court treats both claims as a single claim for declaratory judgment.

16

used (2) for an ulterior or illegitimate purpose (3) resulting in damage." See Millennium Equity Holdings, LLC v. Mahlowitz, 456 Mass. 627, 636, 925 N.E.2d 513 (2010). Ulterior or illegitimate purpose exists where a party "institut[es] a civil action to achieve a collateral purpose other than winning the lawsuit." Am. Mgmt. Servs., Inc. v. George S. May Intern. Co., 933 F.Supp. 64, 69 (D. Mass. 1996). The ulterior motive must be "more than the intent to harass; there must be intention to use process for coercion or harassment to obtain something not properly part of the suit." Broadway Mgmt. Servs. Ltd. v. Cullinet Software, Inc., 652 F.Supp. 1501, 1503 (D. Mass. 1987). For example, Massachusetts courts have found ulterior purpose where a party used process to improperly influence the outcome of a separate, ongoing lawsuit, see, e.g., Am. Velodur Metal, Inc. v. Schinabeck, 20 Mass. App. Ct. 460, 470, 481 N.E.2d 209 (1985); where a company's litigation was intentionally used as a marketing tool against competitor's trade show, see Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 775-76, 489 N.E.2d 185 (1986); where a party filed for attachment to real property to prevent its sale to a third party, see Malone v. Belcher, 216 Mass. 209, 103 N.E. 637 (1913); and where a husband started an action against his wife to coerce a favorable divorce settlement, see American Velodur Metal, Inc. v. Schinabeck, 20 Mass. App. Ct. 460, 481 N.E.2d 209 (1985). Liability for abuse of process will not be based, however, "on the badly motivated use of a procedure that perhaps was burdensome but not improper." Simon v. Navon, 71 F.3d 9, 17 (1st Cir. 1995).

Norris's counterclaim is based on the allegation that Foundation intentionally filed its lawsuit in a venue—the Middle District of Tennessee—where it knew the district court did not have jurisdiction so as to intimidate him and force him to incur attorneys' fees. Norris argues that Gibson's counsel wrote to him in March 2019 after four years of silence threatening to file suit in Massachusetts if he did not return the piano—thereby demonstrating an understanding of where

17

venue was proper—but then filed suit in Tennessee. Norris claims that this was "clearly" a strategic decision designed to exert unfair pressure on Norris, to achieve an unfair advantage, and to force Norris to incur significant costs and expense to have the case transferred to Massachusetts. Even assuming that Norris had proven these allegations, they do not amount to an abuse of process claim where Norris has not shown that Foundation was seeking an outcome other than prevailing on its substantive claims. Summary judgment in favor of Foundation is therefore granted.[6]

### V.    Conclusion

For the foregoing reasons, Norris's Motion for Summary Judgment [Doc. No. 99] is GRANTED. Foundation's Motion for Summary Judgment [Doc. No. 101] is GRANTED IN PART as to Count III (abuse of process) of Norris's counterclaim and is otherwise DENIED.

IT IS SO ORDERED.

May 25, 2022                                             /s/ Indira Talwani
                                                        United States District Judge

---

[6] The court notes that the proper remedy for harassing conduct during otherwise legitimate litigation would have been to serve (and, if necessary, file) a Rule 11 motion.

UNITED STATES DISTRICT COURT OF MASSACHUSETTS
BOSTON DIVISION

GIBSON FOUNDATION, INC.,            )
A DELAWARE CORPORATION,             )
                                    )
                                    )   Case No. 1:20-CV-10682-IT
        Plaintiff,                  )
                                    )
                                    )
vs.                                 )
                                    )
ROB NORRIS D/B/A THE PIANO MILL, A  )
CITIZEN OF MASSACHUSETTS; THE       )
PIANO MILL GROUP, LLC               )
                                    )
                                    )
        Defendants.                 )
                                    )

## FINAL JUDGMENT

On Joint Motion of the parties, the Court enters this FINAL JUDGMENT and ORDERS, ADJUDGES and DECREES as follows:

Gibson Foundation, Inc.("Foundation"), as plaintiff, filed suit against Rob Norris D/B/A The Piano Mill, A Citizen of the United States ("Norris") (DKT#1) and later amended its claim to include The Piano Mill Group, LLC ("Piano Mill" and with Norris, the "Piano Mill Defendants") (DKT#61). Foundation asserts claims for the recovery of a certain Baldwin SD10 piano of historical note based on its association with the concert pianist Liberace (the "Liberace Piano") (serial number 255848) currently possessed by the Piano Mill Defendants. Foundation claims the right to recover the Liberace Piano from the Piano Mill Defendants under the theories of breach of contract, breach of bailment and conversion. The Piano Mill Defendants deny the Foundation's material factual allegations, assert affirmative defenses, and assert counterclaims against the Foundation. (DKT#62). The Piano Mill Defendants counterclaim for abuse of process and

ADD19

separately for declaratory and equitable relief, specifically that they or one of them be declared the owner of the Liberace Piano.

By opinion and order dated May 25, 2022, the Court granted summary judgment dismissing all of Foundation's claims and Piano Mills Defendants' Abuse of Process counterclaim. (Dkt#112). The effect of such order was that the only claims remaining are the Piano Mills Defendants' counterclaims for declaratory and equitable relief as to the Liberace Piano's ownership. The Court has advised the parties of its view that it can not issue an order binding any person or entity other than the parties before the Court.

By motion filed, the Piano Mill Defendants have advised the Court that they withdraw, without prejudice to refiling in the event of a remand of this matter after appeal, their counterclaims for declaratory relief and equitable relief. Accordingly, no live claims remain, and the Court enters the following final relief. The Court ORDERS Foundations claims DISMISSED and grants Foundation no relief based on those claims. As a practical corollary of such dismissal, the Court FINDS, ORDERS, ADJUDGES and DECREES that neither the Foundation nor its predecessors-in-interest, Gibson Brands, Inc. and the Baldwin Piano & Organ Co., has nor shall have any right of possession in the Liberace Piano, either as against the Piano Mill Defendants or their potential assigns.

Based on the parties' joint motion, however, the Court suspends the operation of such relief pending the outcome of any timely appeal filed by the parties with no bond required. Any sale or conveyance of the Liberace Piano during the pendency of the appeal by the Piano Mill Defendants shall be at risk of damages or injunction unless agreed to by the Foundation or otherwise ordered by the Court.

The Court awards costs of court to the Piano Mill Defendants.

The Court DENIES all other relief, specifically requested or not.

2

ADD20

This is a Final Judgment, subject to appeal.

SO ORDERED.

SIGNED this 24 day of October, 2022.

_____

The Honorable Indira Talwani
United States District Judge
District of Massachusetts

3

**ADD21**